**JAFFEE & COMPANY and Wilton L. Jaffee, Jr., Petitioners,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. 835, Docket 34859.**

United States Court of Appeals, Second Circuit.

Argued May 25, 1971.

Decided June 18, 1971.

Jerome J. Londin, New York City (Carro, Spanbock & Londin, New York City, on the brief), and Wilton L. Jaffee, Jr., pro se, for petitioners.

Richard E. Nathan, Special Counsel, Washington, D. C. (Philip A. Loomis, Jr., Gen. Counsel; David Ferber, Solicitor, and James J. Sexton, Atty., Securities and Exchange Commission, Washington, D. C.), for respondent.

Before KAUFMAN, ANDERSON and MANSFIELD,* Circuit Judges.

KAUFMAN, Circuit Judge:

Petitioners Jaffee and Jaffee & Co., a registered broker-dealer, seek review of an order of the Securities and Exchange Commission dated April 20, 1970, prescribing that each petitioner be disciplined on account of Jaffee's violations of Rule 10b–6, 17 C.F.R. § 240.-10b–6, promulgated under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b). We affirm the order with respect to Jaffee but hold that Jaffee & Co. was afforded inadequate notice that it would be disciplined derivatively on account of Jaffee's violations, rather than because of violations attributable directly to the Company, and hence set aside the order disciplining Jaffee & Co.

## I.

None of the essential facts is in dispute. This proceeding was initiated by order of the Commission dated March 24, 1966, which directed a hearing into alleged violations of several provisions of the securities acts by several named respondents, including petitioners here.[1] All of the alleged infractions related to transactions between June 1963 and March 1964 in connection with a secondary offering of common stock in Solitron Devices, Inc., a designer and manufacturer of electronic products. Following a hearing extending for 10 days, the hearing examiner found that Jaffee, while he was the dominant partner in the since defunct partnership and broker-dealer of Jaffee & Leverton, had violated Rule 10b–6 as well as Section 5(b) of the 1933 Act and various antifraud provisions of both the 1933 and 1934 Acts. The examiner recommended that Jaffee be suspended for thirty days but dismissed the proceedings against Jaffee & Co. on the grounds that as a successor and not a mere continuation of the Leverton firm, it could not be held accountable for any of that firm's wrongdoings, and second, that Jaffee & Co. had insufficient notice to permit the imposition of derivative sanctions under Section 15(b) (5) of the Exchange Act, 15 U.S.C. § 78o(b) (5), the provision ultimately relied upon by the Commission.

The Commission granted the petitions for review which were filed by all respondents. Jaffee & Co., in light of the Examiner's favorable decision, did not petition for review. After oral argument, the SEC absolved Jaffee of all but the Rule 10b–6 violations and, rejecting the hearing examiner's finding

* Of the United States District Court for the Southern District of New York, sitting by designation, at time of submission.

1. Besides petitioners, other respondents named in the order instituting the proceedings included Greene & Co., a registered broker-dealer through whom Jaffee conducted much of the trading found by the Commission to have been illegal; Greene & Co.'s general partners, Robert Topol and Irving Greene; Bernard Horn, at the relevant times a trader for Greene & Co.; and M. L. Lee & Co., a registered broker-dealer, and its president and director, Martin L. Levy. The Commission ultimately ordered that Greene & Co. and M. L. Lee & Co. be censured and that Bernard Horn be suspended from associating with a broker or dealer for thirty days.

of insufficient notice, disciplined Jaffee & Co. under Section 15(b) (5) of the 1934 Act on the sole ground that at the time the proceedings were instituted and during the hearings, Jaffee's interest in the firm exceeded 90%, even though the firm had not been in existence at the time Jaffee was found to have violated Rule 10b–6. Because of this disposition of the proceeding against Jaffee & Co., the SEC found it unnecessary to decide whether the firm might also be liable for any violations that may have been committed by Jaffee & Leverton, which the hearing examiner had added as an alleged participant in the various violations charged (but not as a respondent), over the objections of Jaffee & Co. The Commission ordered that Jaffee be suspended from associating with a broker or dealer and that Jaffee & Co.'s registration be suspended, each suspension to run for concurrent periods of twenty days. By order of the Commission the suspensions have been stayed pending the determination of this petition.

## II.

We find no merit to Jaffee's primary arguments that he did not violate Rule 10b–6 because there was no "distribution" within the meaning of that provision in progress at the time he made several purchases of stock in Solitron; or, assuming there was a distribution, that the Commission did not show that his purchases were intentionally or actually manipulative. A registration statement for a secondary offering of 107,700 shares held by thirty-four holders of common stock in Solitron (or about 28% of the then outstanding common stock) was filed under Section 6 of the 1933 Act, 15 U.S.C. § 77f, and became effective on October 11, 1962. The largest block of this stock, consisting of 27,500 shares, was Jaffee's. The prospectus announced that the selling stockholders intended to offer the stock for sale on the over-the-counter market "in the proximate future" and appointed Lee & Co., a New York broker-dealer, "exclusive agent" for the offering. Among other things, each shareholder

agreed to "comply with the provisions of Rule 10b–6."

Jaffee's liability was premised on his purchases of ten shares of Solitron on August 19, 1963 and an additional 7,600 shares at various times between December 26, 1963 and February 13, 1964. Jaffee's only sale of registered stock during this period was of a single block of 3,500 shares on October 30, 1963. As early as May, 1963, however, Lee & Co. had disposed of 16,300 shares owned by other participants in the offering and by March of the following year the total of registered stock sold had risen to 75,100 shares, or almost 75% of the total registered offering. Shortly thereafter, between October 20 and December 30, 1964, Jaffee sold an additional 16,900 shares of his registered stock.

These facts make out a clear violation of Rule 10b–6, which in relevant part prohibits any "person on whose behalf * * * a distribution is being made" or any person "who has agreed to participate or is participating in * * * a distribution * * * to bid for or purchase * * * any security which is the subject of such distribution * * * until after he has completed his participation in such distribution * * *." There are several exceptions to this prohibition, none of which Jaffee invokes to justify his purchases of Solitron. Jaffee does not dispute that had he been actively promoting the sale and had he in fact sold substantial blocks of his registered stock immediately following his purchases, he would have violated Rule 10b–6. See J. H. Goddard & Co., Securities Exchange Act Release No. 7618 (1965). Rather, Jaffee characterizes his offering under the prospectus and registration as a "shelf registration" because—whatever the intent of other participants may have been—Jaffee himself had no present intent to publicly distribute his registered stock immediately. Jaffee seeks to excuse the 3500 shares sold in October, 1963, as an "unsolicited transaction." His related argument—related because each approach would erode the prophylactic value of the rule

—is that the Commission has not shown that Jaffee intended to manipulate the market, or did in fact manipulate it, or did in fact defraud any buyer or seller through his purchases and sales.

Difficult questions may arise with respect to an *underwriter's* purchase of registered stock where he claims a bona fide intent to "shelve" or keep for investment some portion of it. See Whitney, Rule 10b–6: The Special Study's Rediscovered Rule, 62 Mich.L.Rev. 567 (1964); Report of Special Study of Securities Markets of the S.E.C., H.R. Doc. No. 95, 88th Cong., 1st Sess., pt. I at 545–46 (1963). Similarly, Rule 10b–6(c) (3) provides that a person "shall be deemed \* \* \* to have distributed securities acquired by him for investment" (at which point Rule 10b–6 ceases to apply), a provision which gives rise to close questions with respect to when an underwriter, for example, decides to "shelve" a "sour" issue, see 3 Loss, Securities Regulation 1595 (2d ed. 1961). But Jaffee does not and, on this record, could not successfully contend that at any time following the effective date of the registration statement he was holding his registered stock "for investment." His very registration of shares owned by him implied an intention to sell or distribute rather than to hold them for investment. Moreover, Rule 10b–6(a) (3) (xi) provides that for the purpose of determining the liability of an underwriter and others who purchase securities within a brief specified period before the commencement of a distribution, "the distribution shall not be deemed to commence \* \* \* prior to the effective date of the registration statement," where the securities are registered under the 1933 Act, as here. Although the last-quoted provision does not refer to participants in a distribution generally, see Note, The SEC's Rule 10b–6: Preserving a Competitive Market During Distributions, 1967 Duke L. J. 809, 848–49 (1967), the use of the "effective" date of the registration statement to define the operative period of the rule is instructive here. The dangers of market manipulation that Rule 10b–6 was designed to eradicate, see Chris Craft Industries, Inc. v. Bangor Punta Corp., 426 F.2d 569, 577 (2 Cir. 1970) (en banc), were continually present so long as Jaffee's purchases might have artificially inflated the price of Solitron, thereby affording him an opportunity to sell his registered stock at a price higher than he would have received if the market had been permitted to seek its own level. The Commission was clearly justified in applying the rule during a period following the registration and before Jaffee had "completed his participation" in the distribution. See R. A. Holman & Co., Inc. v. Securities and Exchange Commission, 366 F.2d 446, 449 (2d Cir. 1966).

▮ For similar reasons, and contrary to Jaffee's assertion, the Commission need not have shown that Jaffee actually intended to defraud the marketplace through his purchases. The rule proscribes and clearly defines a *practice* which had, prior to the adoption of the rule in 1955, been used fraudulently to distort the over-the-counter market. Where the rule applies, its prohibition is absolute. See Note, 1967 Duke L.J., *supra*, at 817–18. Apart from the plain language of the rule itself, a further internal index to the rule's prophylactic intent appears in its subdivision (a) (3) (xi), which excepts from the exemption there defined, purchases otherwise within the exemption which "are for the purpose of creating actual, or apparent, active trading in or raising the price of" the security in question. Jaffee in effect would have us emasculate the rule by reading similar language into the broad prohibition of the rule itself, although the Commission's clear intent is to require actual manipulation or the like only to draw within the rule's ambit activity that would otherwise be exempted from it.[2]

2. Moreover, there is substantial evidence in the record to support the Commission's

finding that the broker-dealer Greene & Co., which effected the bulk of Jaffee's

■ Finally, Jaffee contends that there is no substantial evidence to support the Commission's finding either that his violation was "willful," a necessary precondition for his suspension, 15 U.S.C. § 78o(b) (5) (1964), or that the purchases involved the use of the mails or an instrumentality of interstate commerce, 17 C.F.R. § 240.10b–5(a) (3). But as our recitation of the undisputed facts shows, Jaffee clearly intended to commit "the act which constitutes the violation." Tager v. Securities and Exchange Commission, 344 F.2d 5 (2 Cir. 1965), which is all that is required in this context. And most of Jaffee's purchases were effected through the broker-dealer Greene & Co., see note 2, *supra*, which at Jaffee's instance placed bids for Solitron stock in the "pink sheets" distributed in interstate commerce by the National Daily Quotations Bureau. The insertion of bids in the sheets is sufficient support for the SEC's jurisdiction. "The use of the mails * * * may be entirely incidental" to the scheme that is the basis for liability, United States v. Cashin, 281 F.2d 669, 673 (2d Cir. 1960), and the use here is better described as integral to the scheme than as merely incidental.[3]

### III.

This brings us to the telling argument urged by Jaffee & Co. Jaffee & Co. was disciplined, as we have already indicated, pursuant to Section 15(b) (5) of the Securities and Exchange Act, 15 U.S.C. § 78o(b) (5). This section permits the Commission, in relevant part, to suspend the registration of a broker or dealer if it finds that the suspension "is in the public interest" and that a "person associated" with the broker or dealer, "whether prior or subsequent to becoming so associated," willfully violated any provisions of various securities laws, including the 1934 Act, or "any rule or regulation under such statutes." *Id.* § 78o(b) (5) (D). As we have held, Jaffee was properly found to have willfully violated Rule 10b–6. Furthermore, Jaffee was clearly a person "associated" with Jaffee & Co., as that term is defined in 15 U.S.C. § 78c(a) (18) to include both "partners" and "controlling" persons, by virtue of the firm's partnership agreement dated December 23, 1964 and effective January 1, 1965. As amended April 1, 1966, that agreement named Jaffee and Kenneth Rich as the two partners in the firm. Jaffee contributed $195,000 of the firm's $200,000 cash capital as well as his Stock Exchange seat, valued at $200,000. Of the firm's net profits on "general business," Jaffee was to receive 94% while Rich's share was only 1%. 5% was to be used for float. The firm's losses were to fall with comparably lopsided disproportion: 99% on Jaffee and 1% on Rich. Thus, although Jaffee last transacted an illegitimate purchase of

purchases, was engaged in market-making activities in Solitron throughout the relevant period. During this same period, Greene & Co. purchased as principal through Bernard Horn, a trader for Greene & Co., 25,000 shares of registered Solitron stock for its own account. Jaffee admitted that prior to the period during which he was making purchases of Solitron, but after the effective date of the registration, he asked Horn to "go into" the "pink sheets" distributed by the National Quotation Bureau, Inc. Thereafter Greene & Co. continuously did insert bids in the quotation sheets. These facts amply refute the core of Jaffee's theory, which is that the dangers Rule 10b–6 were designed to avert were not inherent in Jaffee's activities.

3. We also find no error in the Commission's denial of Jaffee's requests for access to various reports and other material in the files of the Commission including statements made to the Commission by investors in Solitron and an S.E.C. file concerning its negotiations with respect to the mechanics of the October 11, 1962, registration of the Solitron offering. None of this material was available under Rule 11.1 of the Commission's Rules of Practice, 17 C.F.R. § 201.11.1, which incorporates the substance of the Jencks Act, 18 U.S.C. § 3500. Nor is there any indication that the undisclosed material might have been favorable, or even relevant, to Jaffee's defense. See United States v. Andolschek, 142 F.2d 503, 506 (2d Cir. 1944).

Solitron about 11 months before Jaffee & Co. came into being, § 15(b) (5) at least by its terms was a serviceable device for suspending Jaffee & Co. derivatively for Jaffee's prior wrongs.

A precondition to revocation, however, was that Jaffee & Co. be afforded "appropriate notice and opportunity for hearing," 15 U.S.C. § 78*o*(b) (5); see also 5 U.S.C. § 554(b). We conclude that with respect to Jaffee & Co.'s derivative § 15(b) (5) liability, neither condition was met in the proceedings before the Commission.

The order instituting the proceedings in its first paragraph identified Jaffee & Co. as a *continuation* of and as legally indistinguishable from the firm of Jaffee & Leverton, with which Jaffee had been associated at the times of his violations of Rule 10b-6.[4] Paragraphs II.8-D of the order recited that the Commission's Division of Trading and Markets alleged that Jaffee & Co., along with other respondents, had *itself* violated various provisions of the securities acts, including Rule 10b-6. Clearly (since Jaffee & Co. did not exist in name at the time of the violations), the Division had in mind violations by the Leverton firm, which it considered as one with Jaffee & Co. Finally, in part III of the order the Commission broadly defined the purpose of the proceedings instituted as to determine appropriate remedial action, based on the infractions alleged in part II, "pursuant to Sections 15(b), 15A, and 19(a) (3) of the Exchange Act."

Although the complaint mentioned that Jaffee was then a partner of Jaffee & Co., a reasonable construction of the gist of the complaint would have been that Jaffee & Co. had itself committed violations of the securities acts, not that the Commission contemplated only derivative liability. The omnibus citation in the order of hearing to § 15(b), a provision which as codified includes ten sub-

divisions and consumes three pages in the United States Code Annotated, see 15 U.S.C.A. § 78*o*(b), would hardly have alerted Jaffee & Co. to the possibility it would incur derivative sanctions. This is particularly true in view of the fact that Section 15(b) would also have served as the natural vehicle for disciplining Jaffee & Co. directly for its own infractions, if such infractions had been found.

Moreover, as is apparent from the hearing examiner's conclusion that Jaffee & Co. had been insufficiently notified of any potential derivative liability, the hearing itself so far as it involved Jaffee & Co. was concerned exclusively with questions bearing on whether it should be charged with alleged wrongs committed by the Leverton firm. Indeed, although the potential for derivative sanctions was of course inherent in the facts of the case from the outset, the Division apparently never suggested that the Commission actually rely on § 15(b) (5) for that purpose until it made the suggestion in a brief filed with the examiner after the conclusion of the hearing before him. Accordingly, although considerable evidence was introduced at the hearing by both sides concerning the relation between Jaffee & Co. and Leverton, and concerning Leverton's activities during the relative period, no consideration whatever was given to possible derivative sanctions. An absence of evidence bearing on the propriety of such sanctions would appropriately have been expected had Jaffee & Co. been properly notified of the possibility they would be imposed. As the Commission's own brief before us on this appeal spells out at some length, the decision whether to invoke the sweeping power to impose essentially "no-fault" liability on a firm pursuant to § 15(b) (5) is a complex and delicate one, requiring the careful weighing of detailed evidence bearing on the relationship be-

---

4. The Commission alleged that "Jaffee & Co., formerly known as Jaffee & Leverton * * * has been registered as a broker-dealer * * * since May 19, 1963 and

is still so registered." May 19, 1963 was the date of the Leverton firm's registration. Jaffee & Co.'s registration was effective January 1, 1965.

tween the infractor and the firm to be penalized derivatively. Had Jaffee & Co. been afforded adequate notice, it would have had an opportunity, both to take action to lessen the attractiveness of invoking derivative sanctions and to introduce evidence before the hearing examiner tending to show that the use of such sanctions would not have been in the public interest. These opportunities were totally denied it by reason of the course adopted in the notice and at the Commission's hearings.

The Commission argues that notice is always sufficient whenever an order for hearing includes somewhere within its four corners a reference, however veiled and indistinct, to the facts and law which together would support the liability ultimately imposed. But such a mechanistic approach to the notice and hearing requirements of Section 15(b) (5) ignores the interrelationship between those two requirements and thus elevates form over function. As in other similar contexts, a primary purpose of the notice requirement in this case is to permit the respondent a reasonable opportunity to prepare a defense against the theory of liability invoked by those who institute the proceedings against it. A respondent may not reasonably be expected to defend itself against every theory of liability or punishment that might theoretically be extrapolated from a complaint or order if one were to explore every permutation of fact and law there alluded to or asserted. The Commission's proposed test would make a guessing-game of proceedings that the notice and hearing requirement are designed to rationalize.

Thus, for the hearing requirement to have any meaning, the notice provision must be interpreted to require that respondent have "fair notice" of the claim lodged against it "and the grounds upon which it rests," Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). Particularly in view of the inherent complexity of the proceedings and the concomitant major effort on the part of Jaffee & Co.

required to meet any attacks against it, the order instituting these proceedings was patently inadequate to disclose that it would ultimately be required to fight a two-front war. Having drawn all the firm's resources to the defense of the direct liability claim so elaborately limned in the order instituting the proceedings, it was improper and a breach of the notice and hearing requirements of § 15(b) (5) for the Commission then to find (almost as an afterthought because it was not successful in its main thrust), that Jaffee & Co. had won a battle but lost a war it had no reason to know it was waging on a battlefield it had never entered. See In Re Ruffalo, 390 U.S. 544, 550, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968).

Accordingly, the order of the Commission is affirmed with respect to Jaffee but so much of the order as suspends the registration of Jaffee & Co. is vacated.