**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Arnold KIMMES, et al., Defendants.**

**No. 89 C 5942.**

United States District Court, N.D. Illinois, E.D.

June 17, 1992.

As Corrected, Dec. 4, 1992.

Gregory von Schaumburg, S.E.C., Chicago, Ill., for plaintiff.

Thomas Quinn, pro se (U.S. counsel having withdrawn, and French counsel not having appeared of record).

## ORDER OF PERMANENT INJUNCTION AGAINST THOMAS QUINN

SHADUR, District Judge.

This cause has come on to be heard on the motion of Securities and Exchange Commission ("SEC"), pursuant to Fed. R.Civ.P. 56 and this District Court's General Rule ("GR") 12(m), for an Order of Permanent Injunction against Thomas Quinn ("Quinn"). This Court has considered SEC's evidence and arguments,[1] and now being fully advised in the premises makes the following findings of fact ("Findings") and conclusions of law ("Conclusions") and enters the following Order of Permanent Injunction.

To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both those respects, see *Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

*Findings of Fact*

1. This Court has subject matter jurisdiction in this case, as well as personal jurisdiction over Quinn.

2. Both common stock and warrants of GSS Venture Capital Corporation, Inc. ("GSS") and Max, Inc. ("Max"), which were sold by Quinn, certain Quinn controlled companies and co-conspirators of Quinn, are securities under Securities Act of 1933 ("1933 Act") § 2(1) [15 U.S.C. § 77b(1)] and Securities Exchange Act of 1934 ("1934 Act") § 3(a)(10) [15 U.S.C. § 78c(a)(10)].

3. Currently Quinn is serving a four (4) year prison sentence in France after having been criminally convicted for, among other things, the fraudulent offer and sale of securities, including those of GSS and Max, in that country. In addition, Quinn has previously been permanently barred by SEC from associating with any broker or dealer, criminally convicted of securities fraud and permanently enjoined from violating the registration and antifraud provisions of the federal securities laws.

4. During at least all times relevant to this action, Quinn was a partner of Arnold Kimmes and Michael Wright, former defendants in this action against both of whom permanent injunction orders have been entered. In addition, Quinn was a member of a loosely bound group of confederates (including at least Quinn, Arnold Kimmes, Michael Wright, Martin Hirsh, Carl Porto and Gene Kazlow) who were involved in the fraudulent formation of GSS, Max and other corporations.

5. Quinn, as part of that loose confederation, caused GSS to be organized and incorporated in or about January 1985 with a view toward publicly offering its securities, and then in or about December 1985 caused Max to be similarly organized and incorporated. In doing so, Quinn and his confederates caused the identities of the persons actually controlling the two companies to be concealed by causing undisclosed nomi-

1. This Court incorporates the attached transcript as part of this Order of Permanent Injunction. Despite having the motion and related papers personally served upon him, Quinn has failed to answer SEC's motion or otherwise to controvert SEC's evidence. Consequently, pursuant to GR 12(n) SEC's Statement of Uncontroverted Facts, as well as the other evidence offered in support of its motion, is admitted.

nees to be used as officers, directors, founders and principal shareholders.

6. Quinn, as part of the same loose confederation, participated in the sham public offerings of the securities of GSS and Max through the means of materially false registration statements filed with SEC. GSS's offering was completed in July 1985 and raised $150,000. Max's offering was completed in August 1986 and also raised $150,000. Both companies' registration statements, as filed with SEC and publicly disseminated, were materially misleading in that each included untrue statements of material facts, and omitted to state material facts necessary in order to make the statements made not misleading, concerning among other things the nondisclosure of these facts:

(a) that the persons disclosed as officers or directors of GSS and Max were merely figureheads acting on behalf of Quinn and his confederates;

(b) that the persons disclosed as being principal shareholders and owning substantial portions of the common stock of GSS and Max did not in fact pay for the stock;

(c) that Quinn and his confederates, who had no disclosed affiliation with GSS and Max, would and did actually control the companies and that Quinn and certain of his confederates had previous regulatory problems;

(d) that the units offered in the GSS and Max initial public offerings would not in fact be publicly distributed but instead would be purchased by undisclosed nominees of Quinn and his confederates, or by persons that they otherwise controlled, in order to give the appearance that the securities were publicly distributed; [2]

(e) that Quinn provided the initial $5,000 capital for Max's organization and incorporation; and

(f) that Quinn and his confederates intended to inflate artificially the price of GSS and Max securities.

7. By purchasing or causing the purchase of the units of GSS and Max in nominee names or names that they otherwise controlled, Quinn and his confederates caused required brokerage records to be made false and misleading in that the records failed to reflect the actual beneficial ownership of the accounts or failed to disclose the existence of all persons authorized to transact business in corporate accounts.

8. Quinn, as part of the loose confederation, attempted to and did manipulate the aftermarket trading in the securities of GSS beginning in or about July 1985, and Max beginning in or about August 1986, by causing the common stock to trade at artificially high prices that did not reflect the unfettered supply of and demand for those securities. That was accomplished by, among other things:

(a) with regard to GSS, shortly after the initial public offering causing the GSS "box" containing 900,000 of the 1,000,000 GSS shares offered to the public, as well as virtually all of the Class A and B GSS warrants, to end up under Quinn's control, and with regard to Max causing at least 792,000 of the 1,000,000 units offered in the initial public offering to be purchased by Quinn and his confederates;

(b) with regard to GSS, causing the 2,000,000 shares of insiders' stock which were purportedly bought by the GSS officers and directors also to be ultimately delivered to Quinn's control in Cannes, France;

(c) after the respective public offerings of GSS and Max, distributing the securities of GSS and Max to investors in the aftermarket in the United States and Europe through stock brokerage companies controlled or cooperating with Quinn and his confederates; [3]

**2.** Quinn's nominee names included Pele Lechien, Intervest Financial Corporation, Anthony Bliasi, Jan Koks, Hetty Koks, Martin Koks, Tasos Douros, Andreas Spanos, Robert Dzigi, Andrew Chapman and Georgios Samaras, Chart-

house, Ltd., Emcee Asset Management and Emeph Que Funding.

**3.** Stock brokerage companies in the United States controlled or cooperating with members of the Quinn confederation include Stoneridge

(d) buying and selling or controlling the buying and selling of the common stock through undisclosed nominee accounts of Quinn and his confederates or accounts otherwise controlled by them;[4]

(e) causing the distribution of false and misleading registration statements relating to GSS and Max;

(f) causing the preparation and dissemination of false and materially misleading periodic reports that were filed with SEC, including the annual reports on Form 10–K and quarterly reports on Form 10–Q, and false press releases;[5]

(g) directing and coordinating the pricing of specific purchases and sales, and the quoting of the bid and ask prices, of the common stock of GSS and Max through controlled or cooperating broker-dealers such as Stoneridge, Chelsea and Sunrise, and through traders;

(h) restricting the available supply of common stock through the use of nominee brokerage accounts; and

(i) substituting an arbitrary, private pricing mechanism of Quinn and his confederates for the GSS and Max common stock in place of a pricing system based on the collective judgment of buyers and sellers in an open market.

### Conclusions of Law

1. This Court has subject matter jurisdiction over this action.

2. Quinn was part of a conspiracy that engaged in a scheme to defraud involving the offer, purchase and sale of GSS and Max securities. *Lenard v. Argento,* 699 F.2d 874, 882 (7th Cir.1983) reconfirms the familiar definition of the elements of a civil conspiracy as "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between or among the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damage.'" In this instance Quinn, along with defendants Kimmes and Wright, Carl Porto and others, conspired to engage and did engage in a scheme to defraud investors in GSS and Max. In general the scheme involved the formation of public companies, including GSS and Max, by Quinn and his co-conspirators, the use of nominee officers and directors in those companies, sham public offerings of the companies' shares through the use of nominee purchasers controlled by members of the conspiracy, fraudulent aftermarket activity by Quinn and his confederates including the use of false public filings, a false press release, false quotes and sham aftermarket transactions, and finally the retailing of GSS and Max to innocent investors through foreign stock brokerage companies controlled by Quinn and through United States broker-dealers controlled by or cooperating with Quinn's co-conspirators. Consequently the actions of

---

Securities, Inc., Chelsea Securities, Inc. and Sunrise Capital Corp. Stock brokerage companies controlled by Quinn in Europe include Kettler Securities Gmbh; Prudentrust; Kettler, Lugano; Falcontrust Financial, Ltd.; Equity Management Services, S.A. and Financial Management Services, Ltd.

4. For example, in the aftermarket Quinn had 259,000 shares of the 900,000 shares of GSS that he controlled put under his aliases, Andreas Spanos and Tasos Douros, in accounts under those names at broker-dealers in the United States. Quinn bought or sold securities of GSS and Max in the aftermarket under his aliases through accounts at Chelsea Securities, Inc. and Sunrise Capital. In addition, Quinn caused the sale in Europe of GSS or Max securities in which he and his confederates had a beneficial interest, through stock brokerage companies he controlled, including Kettler Securities Gmbh;

Equity Management Services, S.A.; Financial Management Services, Ltd. and Falcontrust Financial, Ltd.

5. For example, the Max filings failed to disclose that the Max checking account was controlled by the Quinn confederation. Similarly, the Max Form 10–Q for the period ended March 31, 1987 falsely stated (1) that the board of directors had approved a forward stock split of the corporation's common stock and warrants and had approved a name change of the company and (2) that the former officers and directors had sold their restricted shares for $4,000 to, among others, Emeph Que Funding, Ltd. and Emcee Asset Management. Finally, the GSS Form 10–K for the year ended December 31, 1985 falsely stated that GSS had entered into a preliminary agreement with Jordans 273 PLC to purchase Blundell's Finance, Ltd. and that that proposal had been abandoned.

Quinn and his co-conspirators satisfy the elements of a civil conspiracy.

3. As co-conspirators, each of Quinn, Kimmes, Wright, Porto and the other members of the conspiracy is liable for the others' acts done in furtherance of the conspiracy (*PaineWebber, Inc. v. Ras,* 767 F.Supp. 930, 933 (N.D.Ill.1991); *Securities Investor Protection Corp. v. Vigman,* 908 F.2d 1461, 1468 (9th Cir.1990)). Moreover, "there is no requirement that every defendant must participate in every transaction in order to have a single conspiracy" (*United States v. Hutul,* 416 F.2d 607, 619 (7th Cir.1969)), nor is it required that each member have direct contact with each other member of the conspiracy (*United States v. Varelli,* 407 F.2d 735, 742 (7th Cir.1969)).

4. Consequently, as an admitted co-conspirator of Kimmes, Wright, Porto and others in the fraudulent formation, offering and aftermarket trading in GSS and Max, Quinn is liable for their acts as well as his own, and therefore he is liable for the substantive violations of the federal securities laws discussed below.

5. For purposes of the securities laws a "scheme to defraud" is merely a plan or means to obtain something of value by trick or deceit. 1933 Act § 17(a) is a general antifraud provision that, among other things, prohibits schemes to defraud in the offer or sale of securities. That provision is given broad scope and flexible interpretation in order to encompass all of the ingenious variations of securities fraud that may arise (*SEC v. Van Horn,* 371 F.2d 181, 185–86 (7th Cir.1966)). 1934 Act § 10(b) is a similar antifraud provision that among other things prohibits schemes to defraud in connection with the purchase or sale of securities and in general makes unlawful the use or employment of any manipulative or deceptive device or contrivance in contravention of SEC rules (see *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976)). Both of those statutory provisions "were enacted to protect investors from fraudulent practices by requiring fairness, disclosure, and the highest ethical standards in the securities business" (*United States v. Jensen,* 608 F.2d 1349, 1354 (10th Cir.1979)).

6. As reflected in the Findings, the scheme to defraud in which Quinn and the other co-conspirators engaged included a myriad of fraudulent acts and practices violative of the federal securities laws. Initially the scheme involved the fraudulent formation of corporations and the preparation, filing and dissemination of false registration statements on Forms S–18. Both the prospectuses of GSS and of the predecessor corporation to Max, Green Mountain Venture Corp. ("Green Mountain"), falsely represented among other things the persons who in fact controlled the companies and provided the initial capitalization. Second, the initial public offerings were not publicly offered and were therefore unlawfully closed in that all or substantially all of the securities sold were placed in undisclosed nominee accounts. Third, the stage was set for the ultimate sale of those secretly held securities at extraordinary profits by (1) the filing and dissemination of fraudulent annual, quarterly and current reports on Forms 10–Q, 10–K and 8–K, which repeated many of the misstatements of the GSS and Green Mountain prospectuses, including false statements about acquisitions and other business developments; and (2) the manipulation of the prices of those securities in the aftermarket through numerous manipulative devices, including fraudulent sales practices, rigged quotes and pricing, and controlled trading by captive brokerage companies such as Chelsea, cooperating brokerage companies such as Sunrise or brokerage companies controlled by Quinn in Europe such as Kettler Gmbh, Falcontrust Financial and Equity Management Services. Each component of that scheme is separately actionable under the antifraud provisions of the federal securities laws.

7. Securities manipulation, the final component or step of the scheme of Quinn and his confederates, is conduct "designed to deceive or defraud investors by controlling or artificially affecting the price of securities" (*Ernst & Ernst,* 425 U.S. at 199, 96 S.Ct. at 1384). Among the funda-

mental purposes of the federal securities laws is the assurance of free and open securities markets in which prices are fixed by the interaction of supply and demand, uninfluenced by manipulative activities that would cause prices to be inflated or depressed artificially (*United States v. Charnay,* 537 F.2d 341, 347–48 (9th Cir.1976); *United States v. Stein,* 456 F.2d 844, 850 (2d Cir.1972)).

■ 8. That being so, any activities that falsely persuade the public that activity in an over-the-counter security is "the reflection of a genuine demand instead of a mirage" are outlawed by 1933 Act § 17(a) and 1934 Act § 10(b) (*SEC v. Resch–Cassin & Co.,* 362 F.Supp. 964, 975 (S.D.N.Y. 1973)). Such activities may include (1) fraudulent promises of quick profits made by salesmen to friends and customers (*United States v. Blitz,* 533 F.2d 1329, 1338 (2d Cir.1976)); (2) directed and controlled trading in a security (*United States v. Cohen,* 518 F.2d 727, 734 (2d Cir.1975)); *United States v. Corr,* 543 F.2d 1042, 1045–46 (2d Cir.1976)); (3) the use of wash sales and matched orders (*Edward J. Mawod & Co. v. SEC,* 591 F.2d 588, 595 (10th Cir.1979)); (4) the use of undisclosed nominees (*SEC v. Commonwealth Chemical Securities, Inc.,* 410 F.Supp. 1002, 1017–18 (S.D.N.Y.1976), *aff'd in part and modified in part on other grounds,* 574 F.2d 90 (2d Cir.1978)); and (5) the use of material misrepresentations in newsletters and otherwise (*United States v. Mahler,* 579 F.2d 730, 732 (2d Cir.1978)). In this instance the use of (among other things) captive or cooperative brokerage companies, nominee accounts, false public filings and a news release by Quinn and his co-conspirators are clearly activities that were meant to persuade the investing public falsely that the activity in GSS and Max was the reflection of genuine demand.

■ 9. By engaging in the conduct described above, knowing the materiality of the misstatements and omissions and acting with the requisite scienter, Quinn vio-

lated and aided and abetted violations of 1933 Act § 17(a) and 1934 Act § 10(b) and Rule 10b–5 thereunder.[6]

■ 10. SEC promulgated Rule 10b–6 to prohibit market manipulation by any person participating in the distribution of a security for the duration of that participation by purchasing or bidding for the security (*SEC v. Blinder, Robinson & Co.,* 542 F.Supp. 468, 477 (D.Colo.1982); *Jaffee & Co. v. SEC,* 446 F.2d 387, 390 (2d Cir. 1971)). "Distribution" has been defined as encompassing "the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public" (*R.A. Holman & Co. v. SEC,* 366 F.2d 446, 449 (2d Cir.1966), quoting *Lewisohn Copper Corp.,* 38 S.E.C. 226, 234 (1958)). Thus the use of undisclosed nominees in an initial public offering extends the period of the distribution until the stock comes to rest in the hands of the investing public.

11. As the Findings reflect, the initial public offerings of GSS and Max were initially placed in controlled and nominee accounts at brokerage companies such as Chelsea and Sunrise. Therefore the initial distributions were not complete until the securities were later marketed and sold out of the undisclosed nominee accounts to the investing public.

■ 12. Quinn, assisted by his co-conspirators, violated and aided and abetted violations of 1934 Act § 10(b) and Rule 10b–6. Quinn and his co-conspirators, through their affiliations either with the issuers or members of the selling group, were prohibited from bidding for or purchasing the securities until the distribution ended. Because the conspirators bid for or purchased those securities (for example, through Quinn's Charthouse account at Sunrise Capital) while undisclosed nominees were still being utilized as a part of the scheme, Quinn is liable for violation of that anti-manipulative provision.

6. That and other SEC rules will be referred to simply as "Rule —." No confusion should be created by that usage, for the numbering and lettering of those rules differs materially from the number of the only Federal Rule of Civil Procedure (Rule 56) referred to here.

13. Rule 17a–3(a)(9) under 1934 Act § 17(a) requires broker-dealers to maintain records for each cash and margin account, showing the name and address of the beneficial owner (*United States v. Bednar*, 728 F.2d 1043, 1047 (8th Cir.1984)).

14. As a part of the scheme referred to in the Findings, undisclosed nominee accounts were used by Kimmes, Quinn and others. In each instance that those undisclosed nominee accounts were maintained at brokerage firms, including Chelsea Securities and Sunrise Capital, the requisite books and records failed to reflect the names and addresses of the actual beneficial owners of the accounts. As a result, certain of the books and records of those brokerage firms were false and misleading.

15. Nor was that failure to record the full beneficial interests in those accounts a technical or trivial matter. Rather the failure to record the nominee relationships was a material device in the manipulation, used to conceal from the appropriate regulatory authorities the identities of the individuals with actual beneficial interests in the initial public offerings and in aftermarket trading.

16. Only a broker-dealer itself can violate 1934 Act § 17(a). However, others may be aiders and abettors of those violations. Quinn admitted that he used undisclosed nominee accounts and knew that his co-conspirators were using undisclosed nominees, and he obviously had no desire to have the actual beneficial ownership reflected as required. Moreover, Quinn substantially assisted the broker-dealers' violations by his use of accounts that did not reveal his control. Consequently Quinn aided and abetted violations of 1934 Act § 17(a) and Rule 17a–3(a)(9).

17. Congress has expressly authorized SEC to seek injunctive relief in the federal courts to prohibit violations of the federal securities laws. 1934 Act § 20(b) provides that when it appears "that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation ... and upon a proper showing ... a permanent ... injunction ... shall be granted...." [7] *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984), quoting *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975), has said:

> Since the basis for such [SEC] injunctions is statutory rather than equitable, "the standards of the public interest not the requirement of private litigation measure the propriety and need for injunctive relief."

18. To obtain such statutory injunctive relief, SEC must demonstrate only that defendants have violated the federal securities laws and that there is some reasonable likelihood of future violations (*United States v. Kaun*, 827 F.2d 1144, 1148 (7th Cir.1987), quoting *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir.1982); see also *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)).

19. In predicting whether there is some reasonable likelihood of future violations, *Holschuh*, 694 F.2d at 144 has said that a court must look at the "totality of the circumstances surrounding the defendants' violations." Accord, *SEC v. Suter*, 732 F.2d 1294, 1301 (7th Cir.1984). Factors to be considered include (1) the gravity of harm caused by the offense; (2) the extent of defendant's participation; (3) defendant's degree of scienter; (4) the isolated or recurrent nature of the infraction; (5) the likelihood that defendant's customary business activities might again involve him in such transactions; (6) defendant's recognition of his own culpability; and (7) the sincerity of defendant's assurances against future violations (*Kaun*, 827 F.2d at 1149–50 and *Suter*, 732 F.2d at 1301, each again quoting *Holschuh*, 694 F.2d at 144).

---

7. Injunctive relief is part of the "arsenal of flexible enforcement powers" (*Ernst & Ernst*, 425 U.S. at 195, 96 S.Ct. at 1382) granted to the Commission by Congress. Indeed, the injunction "is the basic tool provided the Commission for requiring compliance" with the federal securities laws (*SEC v. IMC Int'l, Inc.*, 384 F.Supp. 889, 894 (N.D.Tex.), *aff'd without opinion*, 505 F.2d 733 (5th Cir.1974)).

20. SEC has exhaustively proved the substantive violations of the federal securities laws by Quinn and his co-conspirators. Those same facts also demonstrate the likelihood that Quinn will violate the federal securities laws again if he is not restrained and enjoined (the other prong of the required showing for a statutory injunction). As previously stated in SEC's Statement of Uncontroverted Facts, Quinn has recently been convicted in France on charges arising from his involvement in the fraudulent offer and sale of securities, including GSS and MAX, in that country, and he has been sentenced to four years in prison. In addition, Quinn has previously been (1) permanently barred by the SEC from associating with any broker or dealer, (2) criminally convicted of conspiracy and other felonies, (3) disbarred as a lawyer and (4) permanently enjoined from violating the registration and antifraud provisions of the federal securities laws, all in connection with securities-related activities.

21. All of the evidence demonstrates that Quinn is incorrigible. His recidivistic behavior has spanned a quarter century.[8] Most recently, in February 1991 this Court referred the matter of Quinn's possible contempt of this Court's preliminary injunction to the United States Attorney for the Northern District of Illinois for the institution of an appropriate proceeding once Quinn is released from prison and available in the United States.

22. In view of the foregoing, and in view of the severity of the fraud, the extensive participation by Quinn (in conjunction with Kimmes and the other co-conspirators) in this and other frauds, and particularly in view of the fact that Quinn's "customary business activities" appear to be devoted exclusively to securities fraud, this Court concludes that it is a gross understatement to hold that there is a reasonable likelihood of future violations of the federal securities laws by Quinn. Instead that likelihood is extremely high.

23. Disgorgement of any and all ill-gotten gains received by Quinn, along with prejudgment interest, is an appropriate equitable remedy in this case. This Court therefore reserves the question of the appropriate amount of that disgorgement owed by Quinn and will determine that amount by a separate hearing to be scheduled after SEC has completed necessary discovery.

\* \* \*

Based on the foregoing Findings and Conclusions, it is hereby ordered, adjudged and decreed that:

1. Quinn, his agents, servants, employees and attorneys, and those persons in active concert or participation with any of the foregoing who receive actual notice of this order by personal service or otherwise, and each of them, is or are permanently enjoined as principals or as aiders and abettors from directly or indirectly:

(a) in the offer or sale of common stock, warrants or any other security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails:

(1) employing any device, scheme or artifice to defraud;

(2) obtaining money or property by means of any untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) engaging in any transaction, practice or course of business that operates or would operate as a fraud or deceit upon the purchasers of such securities,

in violation of 1933 Act § 17(a)(1), (2) or (3) [15 U.S.C. § 77q(a)(1), (2) or (3)]; and also

(b) in connection with the purchase or sale of common stock, warrants or any other security, by the use of any means or instrumentality of interstate com-

---

8. Quinn was barred by SEC from associating with any broker-dealer in 1966, convicted of securities fraud in 1970 (*United States v. Quinn,* 445 F.2d 940 (2d Cir.1971)), disbarred in 1974, enjoined in 1986 and convicted in France in 1991.

merce or of the mails or any facility of any national securities exchange:

(1) employing any device, scheme or artifice to defraud;

(2) engaging in any act, practice or course of business that operates or would operate as a fraud or deceit upon any person; or

(3) making any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

in violation of 1934 Act § 10(b) [15 U.S.C. § 78j(b)] and Rule 10b–5 [17 C.F.R. § 240.10b–5] thereunder; and also

(c) by the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange, using or employing, in connection with the purchase or sale of common stock, warrants or any other security, any device, scheme or artifice to defraud by, among other things, while participating in a distribution of securities, bidding for, purchasing or inducing others to bid for or purchase any security that is the subject of the distribution, in violation of 1934 Act § 10(b) [15 U.S.C. § 78j(b)] and Rule 10b–6 [17 C.F.R. § 240.10b–6] thereunder; and also

(d) causing any broker or dealer registered with the SEC pursuant to 1934 Act § 15 to fail to make or keep a record in respect of each cash or margin account indicating the name and address of the beneficial owner of such account (in the case of a joint account or an account of a corporation such records shall also indicate the person or persons authorized to transact business for such account), in violation of 1934 Act § 17(a) [15 U.S.C. § 78q(a)] and Rule 17a–3 [17 C.F.R. § 240.17a–3] thereunder.

2. Quinn shall also disgorge all ill-gotten gains that resulted from Quinn's violations of the federal securities laws, plus prejudgment interest on those amounts. This Court will set the specific amount of disgorgement in separate proceedings upon due notice and motion by SEC.

3. SEC is expressly authorized to engage in continued discovery for purposes of determining the amount of disgorgement. In the meantime all restrictions imposed on Quinn by this Court's September 9, 1989 preliminary injunction order (which this Court hereby declares shall not become merged into this final judgment order) shall remain in full force and effect. This Court shall retain jurisdiction of this matter for all purposes, including ordering any additional equitable relief that this Court shall deem appropriate.

4. This order of permanent injunction is intended to be a final judgment, with the provisions of the preceding decretal paragraphs 2 and 3 representing postjudgment implementation of the relief to be obtained against Quinn. This Court makes an express determination that there is no just reason for delay and expressly directs the Clerk of this District Court forthwith to enter a final judgment to the foregoing effect against Quinn.