SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

GRAYSTONE NASH, INCORPORATED, et al., Defendants.

Civ. A. No. 91–4327.

United States District Court, D. New Jersey.

April 21, 1993.

Neil Gallagher, Asst. U.S. Atty., Newark, NJ, and Bruce M. Bettigole, James G. Mann, S.E.C., Washington, DC, for plaintiff.

Thomas V. Ackerly, Richard J. Adams, and Vincent R. Ackerly, Jr., pro se.

## OPINION

WOLIN, District Judge.

Before the Court is the motion of plaintiff, the Securities and Exchange Commission ("SEC" or "Commission"), for summary judgment on Counts One to Four of the

Complaint[1] and for an order of preclusion against defendants Thomas Ackerly, Richard Adams, and Vincent Ackerly (collectively the "New Jersey defendants"). Plaintiff seeks disgorgement of trading gains and a permanent injunction.[2] Having reviewed the written submissions of the parties and heard oral argument, for the reasons set forth below, the Court will grant plaintiff's motion for an order of preclusion and summary judgment.

## BACKGROUND

### A. The New Jersey Defendants' Trading Activities[3]

Graystone Nash, Incorporated, ("Graystone"), is a corporation formed under the laws of New Jersey and registered with the SEC as a broker-dealer. Mann October 22, 1992 Declaration, ¶ 2. Based in New Jersey, Graystone maintained approximately thirty-five franchised branch offices across the United States, primarily in California and Florida. Thomas Ackerly served as Graystone's President and Chairman of the Board, while Richard Adams was the firm's Vice President. Vincent Ackerly, Thomas Ackerly's brother, was actively involved in Graystone's trading practices, although he held no titled position.[4]

Graystone traded corporate securities in the over-the-counter market, creating markets for securities it previously had underwritten in public offerings. Examples of initial and secondary public offerings Graystone underwrote during the time the alleged securities violations occurred include W.I.N.E., Inc. ("WINE"), Alfa International, Inc. ("Alfa"), ATC Environmental, Inc. ("ATC") and Advanciers Group, Inc. ("Advanciers"), all newly organized companies with no established businesses. Id. ¶¶ 2–4. In these offerings Graystone sold units comprised of shares of common stock and warrants for future common stock purchases. See T. Ackerly Answer, ¶¶ 10, 12; V. Ackerly Answer, ¶¶ 10, 12; Adams Answer, ¶¶ 10, 12; Torrey at 11; Ware at 9.

Almost immediately after these units were sold to customers, the branch offices solicited their return at a fixed price set by Graystone. See Gallego at 8–10; Torrey at 11–12, 16; Ware at 10–11. Upon receipt of the units Graystone would strip the common stock of the warrants and retail the common stock at predetermined, successively higher prices known as ticks. Gallego at 11–13; Torrey at 32–33; Ware at 12–15.

Brokers and operations managers received direct instructions and pressure from the New Jersey defendants to effect these repurchases and resales. See Boyle at 20–21; Torrey at 12–15; Ware at 10–11. The pressure took the form of threats to exclude branches from future new issues or to withhold the monthly payment of funds needed to pay expenses and commissions. Ware at 10–12, 17–18. The New Jersey defendants la-

---

1. The New Jersey defendants are not named in the remaining counts, causes of action five and six, of the Complaint.

2. With this motion the Commission proceeds against the three remaining defendants who are not the subjects of previous orders of the Court. Following entry of default on April 14, 1992, the Court entered permanent injunctions against Graystone and Dennis Williams on May 14, 1992. The Court also entered final judgments of permanent injunction against defendant Shawn M. Crane on November 10, 1992 and defendant Robert L. Rock on December 2, 1992. Each of these defendants also is jointly and severally liable for disgorgement.

3. For its description of Graystone operations, the Court relies on the deposition testimony of former Graystone employees whose positions are specified below and the declarations of SEC investigator James Mann. Due to the number of

witnesses, references to their deposition testimony will be by name and page as follows: "Name at page."

Joseph McGowan was the chairman and co-owner of Outwater & Wells, Graystone's clearing house, while David Spring was its president. Stephen Ware was a broker in Graystone's San Francisco branch and then operations manager in its office in Newport Beach. David Torrey served as a broker in Boca Raton and then opened an affiliate branch in Jacksonville. Jose Gallego and Sean Boyle had senior positions in the Boca Raton office before becoming managers of the Chicago branch. John Mather was the compliance officer at the Boca Raton office while Michael Kupferman was employed as a broker there.

4. When discussing the actions and activities of the defendants, the Court will refer to them interchangeably as "Graystone" and "the New Jersey defendants."

beled customers who refused to sell their units back to Graystone and purchase stock in the aftermarket "new issue whores" and barred them from participating in future issues. Torrey at 18. In some cases client obstinance was met with orders to sell units back to Graystone without the customers' authorization. Gallego at 10, 60–61; Kupferman at 31–32.

During each stage of the offering the New Jersey defendants adopted strict measures designed to ensure its success. First, to guarantee a healthy subscription Graystone allocated units of the initial offering to its branch offices based on their expected sales of common stock in the aftermarket, Boyle at 24–25, 31; Torrey at 22; Ware at 20–21, enforcing such ratios with threats. Torrey at 23–24. These defendants also required customers to pay in advance of the effective dates of the registration statement for the units and the aftermarket stock by cash or certified check. Boyle at 31; McGowan at 59; Torrey at 24–27; Ware at 15. To build a stockpile of customer funds to feed the aftermarket, Graystone delayed the offerings to collect more money and routinely promised branches more units than they ultimately were assigned. Boyle at 25, 26; Gallego at 51–52; Torrey at 28 (New Jersey defendants monitored money held in customer accounts to determine when to declare offering effective), 31–32; Ware at 18–19 (defendants told branches to devote excess funds generated for initial offering unit purchases to aftermarket). Finally, in carrying out their role in the offering, brokers were required to support the stock in the aftermarket by discouraging clients from selling common. Ware at 21–22.

The New Jersey defendants structured the common stock trading to generate interest in the aftermarket. Specifically, as they increased tick prices, they allocated greater blocks of stock for sale, thereby creating the impression, albeit false, that normal market forces were driving prices higher on increasing volume. Boyle at 29–30 (commissions rose as tick prices increased so brokers would sell customers stock at higher prices); Gallego at 11, 12; Torrey at 32–34; Ware at 22–23.

The New Jersey defendants, ever interested in keeping a tight rein on house stocks and generating market confidence in their stocks, continued their aggressive trading practices well after the unit offerings had been placed. They attempted to shut out brokers associated with other firms, either excluding them from the offerings or marking them as targets of Graystone's efforts to "clean up the Street" through purchases of house stock held by other market makers. Gallego at 24–25; McGowan at 87–88. Broker-dealers who purchased house stocks in the open market for resale to Graystone received a small premium. McGowan at 88–92.

The New Jersey defendants directed attempts to stimulate purchases toward their own customers and brokers. To aid their solicitation of sales, Graystone's brokers received material non-public information including confidential business plans and the news of an upcoming acquisition. Gallego at 42–44; McGowan at 45–47; Torrey at 50–54, 56–60; Ware at 38–41. In addition, Thomas Ackerly provided information regarding a company involved in an upcoming offering to an investors magazine and forwarded the resultant article to customers. Torrey at 47. To alleviate excess inventory, branch offices were required to sell blocks of securities upon penalty of reduced commissions, Boyle at 55–57; Gallego at 31; McGowan at 64–65, while incentives in the form of bonuses and special commissions encouraged brokers to push these stocks. Gallego at 30; Torrey at 92–93; Ware at 23–24.

Graystone also attempted to control the markets in which their house stocks traded by discouraging and offsetting customer sales of house stocks, again relying on threats. Ware at 25–27. The New Jersey defendants formalized this pressure by instituting a "buy-sell formula" under which a branch office's commissions would be reduced if its customers did not make net purchases of house stocks. Gallego at 34; McGowan at 18–19; Torrey at 62–64; Ware at 27–28. As a result, on numerous occasions defendants refused to accept sell tickets for house stocks. Gallego at 35; Torrey at 95; Mather Deposition at 34–35. To further dis-

courage such sales, defendants removed commissions earned on buy orders for house stocks if customers subsequently sold the stock, Ware at 32–33, and denied brokers any commission on sell orders.[5] Boyle at 40; Torrey at 69–69; Ware at 28–29. Defendants also delayed execution of sell orders until they could be matched with buy tickets from other customers. Gallego at 100; McGowan at 105–06.[6] House securities were kept in street name rather than the purchaser's name and retained by the clearing house. McGowan at 20–22; Torrey at 39; Ware at 30.

Despite these efforts, Graystone faltered. Thomas Ackerly closed the Boca Raton office, a net seller of house stocks, in December 1988. Two weeks later, Graystone ceased operations. From April 1, 1987 to September 30, 1988 Graystone's trading gains totaled $60,565,581.

## B. Securities Fraud Allegations

Based on these activities, on September 30, 1991, plaintiff filed this action, alleging that defendants engaged in the fraudulent offer and sale at artificial prices of securities in initial public offerings and manipulated the aftermarkets in such securities in violation of the federal securities laws during the period from January 1, 1987 to December 20, 1988. The Commission seeks injunctive relief and disgorgement of all trading gains defendants realized.

Plaintiff's first cause of action charges defendants with violations of section 17(a) of the Securities Act of 1933 (the "Securities Act") and sections 10(b) and 15(c) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b–5 and 15cl–2 promulgated thereunder arising from their allegedly fraudulent activity. Its second cause of action sets out a claim under sec-

tions 5(a) and 5(c) of the Securities Act for the offering and sale of unregistered securities. The third cause of action rests on section 5(b) prospectus violations, while the final charge seeks to hold defendants for improper purchases during distributions contrary to section 10(b) of the Exchange Act and Rule 10b–6 promulgated thereunder.

## DISCUSSION

### A. The Standard For Granting Summary Judgment

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir.1986). In making this determination, a court must draw all reasonable inferences in favor of the nonmovant. Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n. 2 (3d Cir.1983), cert. dismissed, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment must be granted if no reasonable trier of fact could find for the nonmoving party. Id.; Radich v. Goode, 886 F.2d 1391, 1395 (3d Cir.1989).

When the nonmoving party will bear the burden of proof at trial the moving party's burden can be "discharged by 'showing'— that is, pointing out to the District Court— that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct.

---

**5.** A ticket charge accompanied both purchase and sell tickets. Thus, because brokers received no commissions on sell tickets, they actually lost money when their clients sold house stocks. Boyle at 40–41.

**6.** The record suggests that Graystone succeeded in gaining control of its house-stock markets. See McGowan at 29–30 (Thomas Ackerly directed Adams to increase stock price later in trading

day); Ware at 41–43 (using increase in "chop" or commission on particular stock to stimulate purchases of this stock in order to raise its price); Torrey at 39–41 (Graystone changing bid and ask quotes or changing price of stock by altering commission involved); Gallego at 61 ("follow the chop" instruction to brokers, brokers should sell stock paying most commission at any time).

2548, 2554, 91 L.Ed.2d 265 (1986). If the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). When the nonmoving party's evidence in opposition to a properly-supported motion for summary judgment is merely "colorable" or "not significantly probative," the Court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511; *Radich*, 886 F.2d at 1395. Thus, a party opposing summary judgment "must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations, general denials, or ... vague statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497 (3d Cir.1991). Whether a fact is material is determined by substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *United States v. 225 Cartons*, 871 F.2d 409, 410 (3d Cir.1989).

An affidavit in opposition to a properly-supported motion for summary judgment must: (1) show affirmatively that the affiant "is competent to testify to the matters stated therein;" (2) be based on "personal knowledge;" and (3) establish facts that "would be admissible at trial." Fed.R.Civ.P. 56(e); *see Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 282 (3d Cir.1988). In sum, an affidavit offered in opposition to a motion for summary judgment must establish a proper foundation for the facts stated within it. *Williams v. West Chester*, 891 F.2d 458, 471 (3d Cir.1989) (Garth, J., concurring). Affidavits that fail to satisfy these requirements "may not be considered" on a motion for summary judgment. *Hlinka*, 863 F.2d at 282–83.

### B. *Order of Preclusion*

In response to plaintiff's motion for summary judgment, defendants filed affidavits which contain denials of wrongdoing, attacks on the former Graystone employees whose deposition testimony supports this motion and defenses based on lack of scienter. Plaintiff seeks an order of preclusion to prevent the New Jersey defendants from introducing evidence in light of their reliance on their fifth amendment right against self-incrimination during depositions.

■ Courts have recognized that "if a party fails to allow pre-trial discovery of evidence on his claim of privilege, a preclusion order should be entered to bar his subsequent use of the evidence." *SEC v. Grossman*, 121 F.R.D. 207, 210 (S.D.N.Y.1987); *SEC v. Cymaticolor Corp.*, 106 F.R.D. 545, 549–50 (S.D.N.Y.1985).[7] In such a circumstance, provided the movant proves its case, summary judgment is appropriate. *See SEC v. Benson*, 657 F.Supp. 1122, 1129 (S.D.N.Y. 1987).

Fairness dictates this rule. If a party seeks shelter under his right against self-incrimination, he cannot later emerge and attempt to formulate a defense with evidence previously withheld from discovery. *Benson*, 657 F.Supp. at 1129. Further, any resultant prejudice must be borne by the party asserting the privilege and not by the one subjected to its use. *See Lyons v. Johnson*, 415 F.2d 540, 542 (9th Cir.1969), *cert. denied*, 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970).

■ As the instant case demonstrates, any other rule would flout the courts and their discovery process. Allowing the New Jersey defendants to come forward at this stage, after plaintiff has deposed many witnesses and submitted its arguments and proofs, would load the scales unjustly. Thus, the Court will not permit defendants to advance exculpatory claims.[8] The Court now must determine whether plaintiff has demonstrated that it is entitled to judgment as a matter of law.

---

**7.** Although the Third Circuit has not considered the preclusion issue, at least one district court in this circuit has sanctioned its use. *See Goodman v. DeAzoulay*, 539 F.Supp. 10, 16 (E.D.Pa.1981) (granting plaintiff's motion for sanctions and precluding defendant from introducing evidence relating to matters as to which he invoked fifth amendment).

**8.** Although defendants are precluded from introducing evidence in support of their assertions and defenses, defendants may demonstrate that plaintiff's evidence fails to support its claims. *See Benson*, 657 F.Supp. at 1132.

The affidavits of the New Jersey defendants contain claims about their respective roles, re-

## C. Securities Fraud Claims

Plaintiff argues that the New Jersey defendants are liable under various provisions of the federal securities laws for actions arising from their operation of Graystone. The Court will consider each theory in turn.

### 1. Fraud–Based Liability

Plaintiff argues that defendants' manipulation of the unit offerings and the aftermarkets in common stock constitutes violations of section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder (fraud in connection with the purchase and sale of securities), section 17(a) of the Securities Act (fraud in connection with the offer and sale of securities), and section 15(c) of the Exchange Act and Rule 15c1–2 promulgated thereunder (fraud by brokers and dealers in connection with a transaction in or an attempt to induce the purchase or sale of securities). These activities also allegedly run afoul of Rule 10b–6.

#### a. Section 10 and Rule 10b–5 and Section 17(a) of the Securities Act Violations

Section 10(b) of the Exchange Act, which applies to buyers and sellers, makes it unlawful to "employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of any rule promulgated by" the SEC designed to protect the investing public. *Gilmore v. Berg*, 761 F.Supp. 358, 368 (D.N.J.1991) (citing 15 U.S.C. § 78j(b)).[9] Section 17(a) applies to sellers only and proscribes similar conduct,[10] *see Walck v. American Stock Exchange, Inc.*, 687 F.2d 778, 790 n. 16 (3d Cir.1982), *cert. denied,* 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983); *SEC v. Kimmes*, 799 F.Supp. 852, 859, 860 (N.D.Ill.1992), and section 15(c) and Rule 15c1–2 expressly extend liability for fraud to brokers and dealers.

█ There can be no dispute that the New Jersey defendants fall within the statutory definition of "broker." Section 3(a)(4) of the Exchange Act directs that a broker is "any person engaged in the business of effecting transactions in securities for the account of others," 15 U.S.C. § 78c(a)(4), activity which was the backbone of Graystone's operation. Thus, the question for the Court is whether the conduct of the New Jersey defendants satisfies the statutory prerequisites for fraud.

█ To succeed on a claim for liability under these provisions the Commission must

---

muneration and decisionmaking authority at Graystone. Because these defendants previously responded to questions about their employment and responsibilities at Graystone by asserting their fifth amendment right, Thomas Ackerly at 6–7; Vincent Ackerly at 7–8; Adams at 7, the Court will exclude these representations from the record. However, to the extent that the affidavit of Thomas Ackerly, which Vincent Ackerly and Richard Adams join, asserts that permanent injunctive relief is inappropriate on a motion for summary judgment, the Court will consider his arguments in its discussion of remedies. *See* note 14 *infra*.

**9.** Promulgated under section 10, Rule 10b–5 proscribes specific conduct as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5.

**10.** Section 17(a) provides:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. § 77q(a).

show that: (1) defendants engaged in fraudulent conduct; (2) in connection with the purchase or sale of securities; (3) through the means or instruments of transportation or communication in interstate commerce or the mails, *see* 15 U.S.C. § 77q(a); *id.* § 78j(b); and (4) with the requisite scienter. *See Aaron v. SEC*, 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). If misrepresentations or omissions are alleged, the facts misrepresented or omitted must be material. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 232, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). Plaintiff argues that defendants' market manipulations and the affirmative misrepresentations in their registration statements and prospectuses constitute violations of the federal anti-fraud statutes. The Court agrees.

At the outset the Court notes that the Commission has satisfied prongs two and three. The offering and sale of securities, from initial securities offerings to aftermarket trading, formed the basis of the New Jersey defendants' livelihood. *See* pages 866–867 *supra.* In addition, the evidence indicates that the New Jersey defendants relied on the means of interstate commerce to effect these transactions. Graystone headquarters in New Jersey maintained close contact with its branch offices, issuing price sheets and other directives through daily mailings, faxes and phone calls, Boyle at 24, 26, 55; Gallego at 12–13, 31–32; Torrey at 9, 10, 19, and clearing all trades through the New Jersey office. Gallego at 32; Mather at 16; Torrey at 10, 95.

Section 17(a) and clauses (a) and (c) of Rule 10b–5 contain "flat prohibitions of deceitful practices and market manipulations." *United States v. Charnay*, 537 F.2d 341, 350 (9th Cir.1976), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 527, 50 L.Ed.2d 610 (1976). Offenses falling within their purview include "any activities that falsely persuade the public that activity in an over-the-counter security is 'the reflection of genuine demand instead of a mirage.'" *Kimmes,* 799 F.Supp. at 859 (*quoting SEC v. Resch–Cassin & Co.,* 362 F.Supp. 964, 975 (S.D.N.Y.1973)), such as:

(1) efforts of an acquiring group to artificially reduce a target company's stock price through organized large-block selling, *see Charnay,* 537 F.2d at 344; (2) the attempt of an underwriter of a convertible bond offering to deflate the stock price of the issuer by selling its stock short, *see United States v. Regan,* 937 F.2d 823, 829 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2273, 119 L.Ed.2d 200 (1992); and (3) the use of wash sales and matched orders to create the appearance of volume trading. *See Edward J. Mawod & Co. v. SEC,* 591 F.2d 588, 595 (10th Cir.1979). Although more egregious because not limited to an isolated incident, Graystone's fraudulent scheme clearly falls within the scope of the prohibitions of section 17(a) and Rule 10b–5(a) and (c).

In essence, Graystone sought to gain control over the market in their house stocks by strongarming brokers and individual investors. To achieve this goal, the New Jersey defendants imposed mandatory resale rules on all unit offerings, sold specific quantities of common stock at predetermined prices and restricted investors' rights to alienate their shares by refusing to process sell tickets. *See* pages 866–868 *supra.*

Engaging in these activities with the added factor of nondisclosure also violates Rule 10b–5(b), since failing to reveal that the house stock prices were not the result of free market forces constitutes misrepresentations and omissions. *See Charnay,* 537 F.2d at 351. Further, the registration statements and prospectuses, which describe the unit offerings, but not the repurchase rule and the common stock distribution, provide an additional source of omissions and misrepresentations.

With respect to the misrepresentation and omissions claim, the Commission must show that defendants "lacked 'a genuine belief that the information disclosed was accurate and complete in all material respects.'" *In re Phillips Petroleum Securities Litigation,* 881 F.2d 1236, 1244 (3d Cir.1989) (*quoting McLean v. Alexander,* 599 F.2d 1190, 1198 (3d Cir.1979)). In the instant case, although the prospectuses described the offering of common stock and warrant units, the evidence demonstrates that the New Jersey defen-

dants instead planned to execute a carefully devised two-tiered sales scheme.[11]

To determine whether these misrepresentations and omissions are material, the Court must ask "if there is a substantial likelihood that a reasonable [investor] would consider it important in deciding" whether to purchase or sell the securities. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Basic*, 485 U.S. at 231, 108 S.Ct. at 983 (applying *TSC Industries* standard to section 10(b) claim). There can be no dispute that a reasonable investor contemplating participation in Graystone's unit offerings would have wanted to know of the attendant restrictions, which affected both the value and the liquidity of the investment. Indeed, the ability of common stock purchasers to sell their shares required the permission of Graystone as well as its continued existence. As the cascading bids for house stocks following Graystone's closing demonstrate, Mather at 75, Graystone provided the only market for these shares.

■ The Court also finds that there is no genuine issue with respect to the scienter element. Scienter refers to a mental state "embracing intent to deceive, manipulate or defraud." *Hochfelder*, 425 U.S. at 193 & n. 12, 96 S.Ct. at 1381 & n. 12. Recklessness also meets the scienter requirement. *See Phillips Petroleum Securities Litigation*, 881 F.2d at 1244. The evidence in the instant case, however, overwhelmingly indicates that the New Jersey defendants carried out their scheme intentionally.

The conscious nature of the scheme is evidenced by the New Jersey defendants' enforcement efforts. For example, resistance on the part of investors to repurchases of their units was met with orders to resell without the investors' permission. *See* page 867 *supra.* Labeled "new issue whores" these clients were barred from future issues. Further, to ensure compliance with their trading rules, the New Jersey defendants routinely threatened brokers and branch managers. *See* pages 867, 868 *supra.* The New Jersey defendants also ignored the advice of Graystone compliance officers, McGowan at 45–46, Mather at 34–35, actively concealing their activities from them. Mather at 15–16 (compliance officer asked to leave room when branch manager received calls from defendants Thomas Ackerly and Adams).

### b. *Rule 10b–6 Violations*

■ Aimed at market manipulations, Rule 10b–6 prohibits any person engaged in the distribution of securities from purchasing or bidding for the security until that person has completed his participation in the distribution.[12] *See SEC v. Kimmes*, 799 F.Supp. 852, 859 (N.D.Ill.1992). A distribution includes " 'the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public.' " *R.A. Holman & Co. v. SEC*, 366 F.2d 446, 449 (2d

---

11. For example, when discussing upcoming offerings during managers' meetings, defendant Thomas Ackerly would declare that "he couldn't tell you that the clients had to sell [the units] back, because that was illegal, but depending on what I get back is what you get in the aftermarket." Boyle at 20–21.

12. Rule 10b–6 in relevant part provides:
    (a) It shall be unlawful for any person,
       (1) Who is an underwriter or prospective underwriter in a particular distribution of securities, or
          *    *    *    *    *    *
       (3) Who is a broker, dealer, or other person who has agreed to participate or is participating in such a distribution,
          *    *    *    *    *    *
    directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, either alone or with one or more other persons, to bid for or purchase for any account in which he has a beneficial interest, any security which is the subject of such distribution, or any security of the same class and series, or any right to purchase any such security, or to attempt to induce any person to purchase any such security or right, until after he has completed his participation in such distribution.
    17 C.F.R. § 240.10b–6.

Cir.1966) (*quoting Lewisohn Copper Corp.*, 38 S.E.C. 226, 234 (1958)), *cert. denied*, 389 U.S. 991, 88 S.Ct. 473, 19 L.Ed.2d 482 (1967); *Kimmes*, 799 F.Supp. at 859. A distribution is triggered when the incentive to engage in manipulative conduct is first · present. *See SEC v. Burns*, 816 F.2d 471, 476 (9th Cir. 1987) (*quoting* Exchange Act Release No. 18528 [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 83, 104 (Mar. 2, 1982)).

▇▇▇ The Commission argues that the "purported offerings of units were shams, constituting only an intermediate stage in the actual distributions." Brief at 29. The structure of the offerings supports this characterization.

Graystone initially offered units comprised of common stock and warrants. Thereafter, through its mandatory resale rule, unit holders were required to sell their interests back to Graystone who then distributed the common stock. Graystone solicited investors who were willing to purchase both initial units and common stock, and if clients became uncooperative, the New Jersey defendants excluded them from future offerings. *See* page 866 *supra*. Allocations of initial units and common stock to the satellite offices were made jointly. *See e.g.*, note 11 *supra*. Thus, the distribution in the instant case encompassed the sale of both the initial units and the shares of common stock.

As such, it is clear that the New Jersey defendants engaged in conduct proscribed by Rule 10b–6. Specifically, the record indicates that defendants solicited common stock purchases while engaged in the distribution of the units, *see* Boyle at 25–26; Mather at 90–91; Torrey at 24–31; Ware at 12–13, and bid for and reacquired the units before the distribution was complete. *See* Boyle at 20–21; Gallego at 8–13; McGowan at 39–40; Torrey at 18–19; Ware at 10–12.

#### c. *Section 5 Violations*

Plaintiff also seeks to hold the New Jersey defendants under the provisions of section 5 of the Securities Act for offering and selling securities in the absence of a registration statement. The Commission further accuses Thomas Ackerly of distributing a nonconforming prospectus.

#### (i) *Section 5(a) and 5(c) Claims*

Section 5(a) of the Securities Act of 1933 makes it unlawful for any person, either directly or indirectly, to sell a security in interstate commerce unless a registration statement is in effect as to that security. 15 U.S.C. § 77e(a). Section 5(c) extends this liability to those who offer to sell such securities. *Id.* § 77e(c).

▇▇▇ To establish prima facie violations of these provisions of section 5, plaintiff must show that: (1) no registration statement was in effect as to the security; (2) defendants offered to .sell or sold the security; and that (3) defendants used the means of interstate commerce in connection with the offer or sale. *See SEC v. Spence & Green Chemical Co.*, 612 F.2d 896, 901 (5th Cir.1980), *cert. denied*, 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981); *SEC v. Continental Tobacco Co.*, 463 F.2d 137, 155 (5th Cir.1972). Once plaintiff has made this showing, the burden shifts to defendants to demonstrate that the securities were exempt from the registration requirement. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953).

Because the Court found that Graystone offered and sold securities relying on the means of interstate commerce, *see* page 16 *supra*, these section 5 claims turn on the registration-statement element. Initially, the record indicates that Graystone filed registration statements for their offerings. However, this fact alone is not dispositive. Indeed, a registration statement is "effective only as to the securities specified therein as proposed to be offered." 15 U.S.C. § 77f(a); *see First Multifund for Daily Income, Inc. v. United States*, 221 Ct.Cl. 123, 602 F.2d 332 (1979) (registration statement covers only initial offering of securities, not reoffering of those securities after issuer has redeemed them), *cert. denied*, 445 U.S. 916, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980).

▇▇▇ The Court already has determined that the distribution contemplated and implemented by defendants included disbursement of the units in the initial offering and the

shares of common stock. *See* page 873 *supra.* Defendants' registration statements covered offerings of "units" which consisted of shares of common stock and warrants to purchase additional common stock. *See* Mann Declaration, Plaintiff's Exhibit 1. However, once the units were sold, Graystone, through its mandatory resale rule, required unit holders to sell their interests back to Graystone. Graystone then distributed the common stock at predetermined, escalating tick prices. These distributions of common stock in the aftermarket were not registered.

### (ii) *Section 5(b) Claim*

Section 5(b), designed to prevent conditioning of the market for upcoming offerings, prohibits transmittal of a prospectus that does not meet the requirements of section 10 of the Securities Act. 15 U.S.C. § 77e(b)(1). A prospectus includes any "notice, circular, advertisement, letter, or communication, written or by radio or television, which offer any security for sale." 15 U.S.C. § 77b(10). The term "offer" encompasses "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." *Id.* § 77b(3).

Section 10 requires that a prospectus contain the information provided in the registration statement in accordance with the schedule of section 77aa. 15 U.S.C. § 77j(a)(1). Schedule A requires, among other information, a balance sheet and a profit and loss statement of the issuer. 15 U.S.C. § 77aa(25), (26).

█ The Commission argues that the feature on W.I.N.E. that appeared in *Speculators Magazine* was a nonconforming prospectus. The article recommended W.I.N.E. as a good investment, depicted Graystone as a highly successful underwriter and concluded with "Call Graystone Nash" followed by the firm's address and phone numbers. *See* Plaintiff's Exhibit 14 at 2, 4.

The Court concludes that this story constituted an offer and therefore a prospectus. *See* 38 S.E.C. 882, 1959 WL 2717 at *3 (1959). Because it did not contain information required under section 77aa or a correct

description of the nature of the offering, its publication and distribution, which occurred in advance of the effective date of the offering, Torrey at 47, was prohibited. Therefore, in causing its publication and dissemination to customers through Graystone's branch offices, Torrey at 48, Thomas Ackerly violated section 5(b) of the Securities Act.

### D. *Remedies*

Describing the conduct of the New Jersey defendants as "outrageous," the Commission asks the Court to enjoin defendants from future securities violations and to order disgorgement. The Court will review each remedy in turn.

#### 1. *Injunctive Relief*

Section 20(b) of the Securities Act, in relevant part, provides:

> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, the Commission may, in its discretion, bring any action in any district court of the United States ... to enjoin such acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

15 U.S.C. § 77t(b). Similarly, section 21(d) of the Exchange Act provides:

> Whenever it shall appear to the Commission that any person is engaged or about to engage in acts or practices constituting a violation of any provision of this chapter, the rules or regulations thereunder, ... it may in its discretion bring an action in the proper district court of the United States ... to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

15 U.S.C. § 78u(d).

█ In deciding whether an injunction should issue the Court must determine whether there is a reasonable likelihood that

the defendant, if not enjoined, will again engage in illegal conduct, *SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir.1980); *SEC v. Savoy Industries, Inc.*, 587 F.2d 1149, 1168 (D.C.Cir.1978), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979). To succeed, therefore, plaintiff must establish both past violations and a reasonable likelihood of future wrongs.[13]

■ In assessing the reasonable likelihood of continued violations, courts focus on a variety of factors, including: (1) the degree of scienter involved on the part of the defendant; (2) the isolated or recurrent nature of the violation; (3) the defendants' recognition of the wrongful nature of his conduct; (4) the sincerity of his assurances against future violations; and (5) the risk of future violations defendant's professional occupation creates. *Bonastia*, 614 F.2d at 912. No one factor is determinative, however. Instead, in making its prediction about the risk of future wrongs, the Court must focus on the totality of the circumstances surrounding the defendants and the past violations. *Id.; SEC v. First City Financial Corp.*, 890 F.2d 1215, 1228 (D.C.Cir.1989).

■ In the instant case, these factors weigh in favor of the entry of an injunction.[14] The fraudulent activities of the defendants touched all of Graystone's transactions. From the pricing of stock offerings to brokers' commissions, the New Jersey defendants structured all facets of their business to enhance their control of the market. This scheme required detailed planning, firm execution and almost constant monitoring, endeavors which the New Jersey defendants carried out with intent and apparent relish. In addition, defendants have refused to acknowledge any wrongdoing, and at least one New Jersey defendant remains an active participant in the securities business.

### 2. *Disgorgement*

■ Disgorgement, a remedy well within the equitable authority of the Court, *see SEC v. First City Financial Corp.*, 890 F.2d 1215, 1230 (D.C.Cir.1989), is a common response to securities law violations. *Id.* (violation of Exchange Act section 13(d) disclosure requirements); *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir.1987) (insider trading), *cert. denied*, 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988); *National Westminster Bancorp v. Leone*, 702 F.Supp. 1132, 1137 (D.N.J.1988) (insider trading); *SEC v. Penn Central Co.*, 425 F.Supp. 593, 599 (E.D.Pa. 1976) (section 10(b) and section 17(a) violations). Primarily designed to deprive a wrongdoer of his unjust enrichment, disgorgement also deters others from violating the securities laws, *First City*, 890 F.2d at 1230, and compensates defrauded investors. *See SEC v. World Gambling Corp.*, 555 F.Supp. 930, 934 (S.D.N.Y.) (disgorgement serves both general and specific deterrent purposes especially in cases involving small losses to individual investors where private remedies less effective), *aff'd without opinion*, 742 F.2d 1440 (2d Cir.1983).

■ The actual profit defendants obtain serves as the equation for determining a disgorgement award. *See Leone*, 702 F.Supp. at 1136–37. Given the difficulty in predicting market fluctuations, however, the amount ordered "need only be a reasonable approximation of profits causally connected to the violation." *First City*, 890 F.2d at 1231. The SEC bears the burden of demonstrating that its disgorgement figure meets this standard. *Id.* at 1232. If benefits result from both lawful and unlawful conduct, plaintiff must distinguish these legal and illegal profits, *see CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 93 (2d Cir.), *cert.*

---

**13.** The Commission, unlike a private litigant, is not required to establish a threat of irreparable harm or the absence of an adequate remedy at law. *See SEC v. Caterinicchia*, 613 F.2d 102, 105 n. 3 (5th Cir.1980). The Supreme Court long has recognized that in this circumstance injunctive relief is necessary to protect the interests of the investing public. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191, 84 S.Ct. 275, 282, 11 L.Ed.2d 237 (1963).

**14.** The Court is confident in its ability to make this determination on a motion for summary judgment in light of the overwhelming and undisputed evidence of defendants' wrongdoing the record contains. Of particular concern is the defendants' continued insistence that they did not violate the securities laws. *See* T. Ackerly ¶ 9; Adams at p. 5; V. Ackerly ¶¶ 3, 5.

*denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986), unless the fraud was systematic and pervasive. *Id.*

Following these guidelines, the Court concludes that an appropriate measure of disgorgement in the instant case is the trading gains Graystone and its participants recognized, in the amount of $60,565,581. This figure represents the total trading gains Graystone took in from April 1, 1987 to September 30, 1988, *see* Mann May 11, 1992 Declaration ¶¶ 2–3, an amount the Court previously approved in the judgment entered against defendants Graystone and Dennis Williams on May 14, 1992. As in *British Am. Commodity Options Corp.,* "[t]he problem in this case is finding *any* activity that was lawful." *British Am. Commodity Options Corp.,* 788 F.2d at 93.

## CONCLUSION

For the foregoing reasons, the Court will grant plaintiff's motion for summary judgment on Counts One through Four against the New Jersey defendants and issue a permanent injunction and an order of disgorgement against the New Jersey defendants.