**Gordon S. OPPENHEIMER, on behalf of himself and all others similarly situated, Plaintiffs,**

**v.**

**NOVELL, INC., Raymond J. Noorda and James R. Tolonen, Defendants.**

No. 93–C–1018–S.

United States District Court, D. Utah, Central Division.

May 4, 1994.

Thomas R. Karrenberg, Anderson & Karrenberg, Salt Lake City, UT, Daniel W. Krasner, Lawrence P. Kolker, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, Francis M. Gregorek, Wolf, Haldenstein, Adler, Freeman & Herz, San Diego, CA, for plaintiff.

Stepehn J. Hill, Snow, Christensen & Martineau, Salt Lake City, UT, Boris Feldman, Terry T. Johnson, Wilson, Sonsini, Goordich & Rosati, Palo Alto, CA, for defendant.

## ORDER

SAM, District Judge.

This securities fraud class action is before the court on defendants' Motion to Dismiss. This motion is based on several arguments: first, that the complaint fails to adequately allege scienter in the making of false statements; second, that the complaint fails to identify the persons who allegedly made false statements to stock analysts; and third, that the facts which defendant is alleged to have withheld were commonly known to the market. The court has considered these arguments and plaintiff's responses to them, and rules as follows:

### I. Factual Background.

Plaintiff has alleged that in the first two quarters of fiscal 1993, defendant Novell performed very well, with a growth rate of 26%. Sales were strong both in the United States and abroad, and a new software product was just being introduced. Complaint, ¶ 23. However, as plaintiffs allege, many stock analysts were concerned about Novell's prospects for the third quarter. Complaint, ¶ 24. Essentially, these concerns revolved around suspicions that the strong second quarter earnings were due to what is called "channel stuffing"—the practice of maintaining or increasing production and hiding slow sales by piling up inventory with the company's distributors. The analysts also had concerns about the new software offering; they were suspicious that sales of that product were made at the expense of other Novell products. Complaint, ¶¶ 24–26.

As a result of these concerns, a number of analysts expressed skepticism about Novell's ability to maintain its growth into the third quarter. As plaintiff alleges, these pessimistic evaluations "put pressure" on Novell stock, and shares trading at about $27–29 following the second quarter earnings announcement in May fell to about $23 in June. Complaint, ¶ 28.

Plaintiff alleges that Novell sought to prop up the price of its stock by reassuring investors that inventory levels were not too high, and that sales prospects for the third quarter

were good. The specific statements alleged to have been made by Novell are as follows:

1. **"[A] series of positive statements to stock analysts scheduled to release Novell reports in late June 1993."** Complaint, ¶ 29. Specifically, plaintiff alleges that one analyst reported that "Novell strongly disputed statements made by *Computer Reseller News* about its distribution inventory levels." Another analyst reported that "management has stated that results from Europe have bottomed and that the outlook for that region has brightened." Plaintiff alleges that another analyst upgraded his "neutral" rating of Novell to "attractive" after "the Company advised him that it disputed the ... *Computer Reseller News* article." This analyst stated that "sales and accounting receivables figures supplied to him by Novell indicated that the Company's suspected 'channel stuffing'— that is, urging distributors to take extra product at the quarter's end to meet Wall Street earnings forecasts—'was not significant.'" None of these statements reported second hand by analysts have been attributed to any specific individual at Novell.

2. **Public statements made by Peter Troop, Novell's Director of Corporate Relations, at a technology conference on June 29th.** Plaintiff alleges that Mr. Troop addressed a group of analysts and investors at a Bear Stearns technology conference. Complaint, ¶ 31. The complaint contains a quoted excerpt from an article which appeared in the Dow Jones News Service. The only language which appears as an actual quote from Mr. Troop is as follows: "'We're comfortable with inventories in light of their consistently [sic] with prior periods.'" The article goes on to say that "Troop told Dow Jones the company is comfortable with analysts' consensus estimates for the fiscal third quarter, which ends next month." The article then reports that the mean estimate of earnings for the third quarter is 27 cents per share.

Following these statements, Novell stock sold at about $25–26 per share. Complaint, ¶ 32. However, four weeks after the Bear Stearns conference, on July 26, Novell announced a shortfall in projected sales, stating that third quarter earnings would decline "modestly" from the second quarter. Novell also announced that income for the quarter was now projected to be the same as one year earlier, about 21 cents per share. Complaint, ¶ 33. As a result of this announcement, the price of Novell stock went from $24¾ on Friday, July 23 to $21¾ on Monday the 26th, dropping to $18⅝ on Tuesday July 27. Complaint, ¶ 34.

When the third quarter ended, Novell announced on August 25 that earnings would be 20 cents per share. Novell stock traded at $19⅛ following that announcement. Complaint, ¶ 37.

## II. Standards for Dismissal.

■ Under the Federal Rules of Civil Procedure, a defendant may move to dismiss a cause of action when the plaintiff has failed "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). In considering a motion to dismiss, "the pleadings should be liberally construed, all well-pleaded factual allegations must be accepted as true, and all reasonable inferences must be drawn in favor of the plaintiff." *Garcia v. Eidal Int'l Corp.*, 808 F.2d 717, 719 (10th Cir.1986), *cert. denied*, 484 U.S. 827, 108 S.Ct. 94, 98 L.Ed.2d 55 (1987); *accord Castleglen, Inc. v. Commonwealth Sav. Ass'n*, 689 F.Supp. 1069, 1070 (D.Utah 1988). Thus, a complaint does not warrant dismissal "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Castleglen*, 689 F.Supp. at 1070.

■ Securities laws combating fraud should be construed liberally to promote their remedial purpose of protecting the investing public. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 386–87, 103 S.Ct. 683, 689–90, 74 L.Ed.2d 548 (1983). However, pursuant to the Federal Rules of Civil Procedure, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). Rule 9(b) not only applies generally in securities fraud cases, *see Seattle–First Nat'l Bank v. Carl-*

*stedt,* 800 F.2d 1008, 1010 (10th Cir.1986), but courts strictly enforce it under the securities laws, requiring "detailed statements" of the specific, fraudulent conduct. *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 986 (10th Cir.1992).

In applying Rule 9(b), the Tenth Circuit in *Carlstedt* explained the requirements of pleading fraud "with particularity." *Carlstedt* adopted as a "correct statement of Rule 9(b) requirements in securities fraud cases" a standard applied by the District Court of Colorado:

> Rule 9(b) does not ... require the pleading of detailed evidentiary matter, nor does it require any particularity in connection with an averment of intent, knowledge, or condition of mind. It only requires identification of the circumstances constituting fraud or mistake. That requirement means ... that individual plaintiffs should identify particular defendants with whom they dealt directly, and from whom they purchased stock; that individual plaintiffs should designate the occasions on which affirmative statements were allegedly made to them—and by whom; and that individual plaintiffs should designate what affirmative misstatements or half-truths were directed to them—and how.

*Carlstedt,* 800 F.2d at 1011 (quoting *Trussell v. United Underwriters, Ltd.,* 228 F.Supp. 757, 774–75 (D.Colo.1964)); *accord Bradford v. Moench,* 670 F.Supp. 920, 924–25 (D. Utah 1987); *see also Cook v. Zions First Nat'l Bank,* 645 F.Supp. 423, 424–25 (D. Utah 1986) (Plaintiffs must "set forth in specific terms the time, place, content, and manner of each defendant's alleged material misrepresentations or otherwise fraudulent conduct," particularly "in cases involving multiple defendants.").

■ However, providing defendant with adequate notice is not the only concern addressed by Rule 9(b). The Tenth Circuit has noted that 9(b) " 'also safeguards defendant's reputation and goodwill from improvident charges of wrongdoing ... and it serves to inhibit the institution of strike suits....' " *Farlow,* 956 F.2d at 987. In order to address these concerns, it has been held that a plaintiff must do more than simply specify the allegedly fraudulent statements and make conclusory assertions that the statements are false. Rather, a plaintiff must have a reasonable basis for believing that he has been the victim of fraud prior to bringing suit. Although it is true that a plaintiff might have difficulty alleging facts which would support such an inference, since such facts may be in the defendant's control and thus could only be brought to light through discovery, that risk of concealment must be balanced against the risk of allowing plaintiffs to broadly allege fraud when there is no reasonable indication of such. Accordingly, at the very least, plaintiff must plead facts which, if proven, would logically support an inference that defendant intentionally deceived him; otherwise, a plaintiff could allege fraud simply by making conclusory assertions about a defendant's state of mind. *See Lochhead v. Alcano,* 697 F.Supp. 406, 419 (D. Utah 1988) ("[plaintiff] need only plead factual circumstances implying fraudulent intent"); *In re United Telecom. Sec. Litigation,* 781 F.Supp. 696, 702 (D.Kan.1991) ("Although Rule 9(b) permits scienter to be averred generally, courts have repeatedly required plaintiffs to plead the factual basis that gives rise to a strong inference of fraudulent intent"). The court in *United Telecom* acknowledged that the Tenth Circuit's decision in *Seattle–First* establishes a liberal pleading requirement, but reasoned that "even under a liberal application of the rules, plaintiffs must still provide some factual support for the conclusions of fraudulent intent." *United Telecom,* 781 F.Supp. at 702. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 776 (2nd Cir.1991); *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir. 1991).

## III. Identification of Statement Sources.

With regard to the statements (# 1 above) which plaintiff alleges were made to analysts by unnamed Novell officials, defendants argue that in order to support a 10(b) action, the identities of these speakers must be alleged. This argument is supported by a recent Second Circuit decision which considered a very similar set of facts; plaintiff's allegations of fraud were based upon news

stories which contained information supposedly learned from corporate insiders, but the information was not attributed to any named source. *In re Time Warner Inc. Securities Litigation,* 9 F.3d 259 (2d Cir.1993). In that case, the court balanced the competing risks of undeterred fraud and baseless litigation, and decided that allowing a suit to proceed on the basis of unattributed statements in news stories was unjustified. In response, plaintiff cites a number of cases in which courts allowed unattributed statements to support a fraud claim, but these cases were considered by the court in *Time Warner,* and distinguished. These cases all involved statements which, although not attributed to a single individual, were nevertheless adopted by the company in some way, either because they were made in the form of an official press release, or because the company had put its official "imprimatur" on the specific statements reported in the news story. *Id.* at 265. *See In re AnnTaylor Stores Sec. Litig.,* 807 F.Supp. 990 (S.D.N.Y.1992); *DiVittorio v. Equidyne Extractive Indus.,* 822 F.2d 1242 (2d Cir.1987); *Alfus v. Pyramid Technology Corp.,* 764 F.Supp. 598 (N.D.Cal. 1991). Plaintiff points to the statements made by Mr. Troop as being essentially an affirmation of the unattributed statements, but if Troop's statement is to be used in this way, it cannot support anything beyond its own terms—i.e., if the unattributed statements go beyond what Troop said, then they cannot be used to support the fraud allegation. In that case, the unattributed statements must be ignored, and Troop's statements must be considered alone as the basis for this suit.

## IV. Adequacy of Scienter Allegation.

There are three parts to the statement of Peter Troop as alleged by plaintiffs (Complaint, ¶ 31):

**1. Inventory levels are not out of character with what Novell has traditionally seen with new product introductions.** This statement does not appear to be disputed. Nowhere in the complaint does plaintiff allege that the inventory level, though high, was unusual for new products.

**2. "We're comfortable" with the current inventory levels.** Strictly speaking, this appears to be an expression of feeling which fails to provide a standard for determining truth or falsity. It could mean that Troop is happy about the inventory levels, or it could simply mean that Troop does not fear that the company will be significantly harmed because of the inventory levels. Reading this statement in the light most favorable to plaintiff's position, we could consider this statement as being an affirmation that the inventory levels are not a problem. However, even this interpretation does not appear to allow room for a finding of fraudulent intent. There is no allegation that Novell misrepresented the inventory levels, thus it just appears to be an attempt to be positive about publicly known facts. A positive spin on publicly known facts is not actionable. *See Raab v. General Physics Corp.,* 4 F.3d 286, 289 (4th Cir.1993).

**3. The company is "comfortable" with analysts' consensus estimates for the fiscal third quarter."** Again, this could be viewed simply as an expression of optimism; this statement seems to mean simply that Novell is pleased with the way the analysts have estimated their third quarter performance. However, viewing this statement most favorably to plaintiff's position, it could be read as an affirmation that, in fact, the analysts' estimates are correct; that Troop has in effect adopted the analysts' consensus as the company's own projection. However strained this interpretation seems, the court will, on a motion to dismiss, accept this interpretation.

Under this reading, Troop's statement implies an affirmative prediction that the third quarter earnings would be as projected by the analysts. In order to prevail, plaintiff must ultimately prove that Troop knew or should have known that this was impossible. At the pleading stage, plaintiff must allege facts which, if true, would indicate or imply that the statement was made in bad faith. Plaintiff attempts to provide such a factual basis by alleging that Novell was doing very poorly at the time, describing the negative aspects of Novell's business at the time. The Complaint alleges that Novell's strong sec-

ond quarter was based on channel stuffing and discounts offered to distributors. Plaintiff alleges, therefore, that Defendants knew that extremely high sales levels would be required in order for the third quarter to be successful, and that there was no basis for believing that such was possible. *See* Complaint, ¶ 39 and following.

This argument is defective in that it fails to allege that Novell was concealing something. The fact of concealment is necessary in this case because Troop did not make his own projection; rather, even under plaintiff's strained reading of the statement, Troop merely adopted the predictions of the analysts. In order for that adoption to have been made in bad faith, Troop would have had to know something which the analysts did not know. With a few irrelevant exceptions,[1] there are no such allegations. Indeed, the complaint itself indicates that Novell actively provided information to the analysts. *See* Complaint ¶ 21. Logically, in order for Troop to have been lying when he indicated his "comfort" with the analysts' predictions, those analysts must also have been lying, since the Complaint implies that they all had access to the same information.

██ Finally, the issue of motive is relevant to the court's consideration of the adequacy of plaintiff's fraud allegations. If a plaintiff is able to allege facts which would provide a defendant with a motive to conceal negative information, the court should look more closely at the defendant's actions. Such a motive is usually supplied when a defendant has, for example, sold stock after fraudulently inflating its price, or bought stock after depressing its price.

In this case, plaintiff has not alleged that Novell or the named defendants sold any stock during the period between the statements and the end of the quarter. Indeed, the complaint itself states that Novell initiated a stock buy-back program at the same time it was fraudulently inflating the value of the stock. This means that plaintiff is alleging that Novell was inflating the value of its stock against its own economic interests.

However, in arguing that defendants had a motive to inflate the value of Novell stock during the class period, plaintiff states that:

> By preventing a decline in the price of Novell stock, defendants were able to prevent the dilution in value of their personal stock holdings and options in Novell. They likewise sought to maintain Novell's image for success and growth, an issue of particular importance during the Class Period because of competitive pressures from Microsoft, which threatened Novell's market for computer networking products.

Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss, p. 9. This does not appear to the court to be a reasonable motive. The class period was about four weeks, and there seems to be little value in artificially maintaining the value of stock holdings for such a limited time. Indeed, the plaintiff's proposed motive actually seems to cut the other way; if one wishes to "maintain [an] image for success and growth," a bad report a few weeks after expressing optimism would seem to be counter-productive. There are no facts alleged which would support an inference that postponing the negative report for a few weeks would have any effect on Novell's market position against Microsoft. Indeed, it would seem that a sudden, unexpected announcement would be far worse in this respect than a more gradual release of negative indicators from the begin-

---

1. ¶ 39 of the Complaint purports to list facts which Novell concealed, and which make the adoption of the analysts' predictions misleading. First, plaintiff asserts that inventories were unusually high by the end of the second quarter. The complaint itself shows that this information was well known; it was the reason why the stock was "pressure[d]" at the time of the Troop statements. Complaint, ¶ 28. Second, plaintiff alleges that "Novell had offered substantial discounts to its distributors to encourage high inventory positions ..." However, it is the inventory levels themselves, not the underlying reasons for those levels which affected the stock performance in the third quarter; even if it is true that Novell failed to disclose these discounts, it is not material. Finally, plaintiff alleges that defendants failed to disclose "that unprecedented demand and record sales levels would be required to reduce its channel inventory to manageable levels and prevent the third quarter from being the disaster it turned out to be." This is not a substantive fact that was concealed; rather, it is the very thing that the analysts themselves would be speculating about.

ning of the quarter. *See Goldberg v. Household Bank, F.S.B.,* 890 F.2d 965, 967 (7th Cir.1989).

Courts have looked with skepticism at allegations of wrongdoing in cases where there was no apparent motive for it. *See Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("It follows from these settled principles that if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary."); *DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.), *cert. den.* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). ("One who believes that another has behaved irrationally has to make a strong case."). Indeed, a recent case has reasoned that a court faced with an irrational motive theory should raise the plaintiff's standard at the pleading stage. *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061 (5th Cir.1994). *Tuchman* is very similar to the instant case. In it, plaintiff did not allege that defendants had traded in the company's stock at fraudulently inflated prices; instead, plaintiff proposed as a motive that

> the defendants acted for the purpose of creating an artificially inflated picture of DSC's market share and gaining competitive advantage, maintaining an artificially inflated price for the common stock, ... preserving defendants' positions, perquisites and emoluments of office, securing, maintaining and/or increasing compensation for themselves, and/or inflating the value of their shares and options for shares of DSC.

*Tuchman,* 14 F.3d at 1068. This proposed motive reads almost exactly like the argument plaintiff has made in this case, and the court rejected it as irrational. Based on this lack of motive, the court then dismissed the case. "Since the defendants' motive to commit securities fraud is not readily apparent, the plaintiffs face a more stringent standard for establishing fraudulent intent." *See also Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46 (2d Cir.1987), *cert. den.,* 484 U.S.

1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989) (en banc) ("A common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so. Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.")

Since the Complaint fails to allege a reasonable basis for inferring that fraud has occurred, especially in light of the fact that the Complaint does not indicate any reasonable motive for fraud under the facts alleged, defendants' Motion to Dismiss is granted. The Complaint is hereby dismissed without prejudice, and plaintiff is given leave to amend his complaint if he is able to allege facts which will address the deficiencies identified by the court in this ruling.

It is so ordered.