Karl E. BROGREN, and Paul R. Havig,
on behalf of themselves and all others
similarly situated, Plaintiffs,

v.

Carl R. POHLAD, et al., Defendants.

Andrew SALPERTO, on behalf of himself
and all others similarly situated,
Plaintiffs,

v.

Carl R. POHLAD, et al., Defendants.

Civ. Nos. 3–93–714, 3–94–20.

United States District Court,
D. Minnesota,
Third Division.

March 27, 1997.

Frank A. Taylor, Robert C. Moilanen and Karen R. Cole, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, MN, for Plaintiffs Brogren and Havig.

Lubna M. Faruqi, Faruqi & Faruqi, L.L.P., New York City, Roger W. Kirby and Jeffrey H. Squire, Kaufman, Malchman, Kirby & Squire, L.L.P., New York City, Brian Kidwell, Leonard, O'Brien, Wilford, Spencer & Gale, Minneapolis, MN, for Plaintiff Salperto.

Gregory P. Joseph, Douglas H. Flaum, Jeffrey S. Tolk, David R. Buchanan and Laura G. Birger, Fried, Frank, Harris, Shriver & Jacobson, New York City, David P. Pearson and Thomas H. Boyd, Winthrop & Weinstine, St. Paul, MN, for Defendants Pohlad, Benson, Carlson, Handmaker, Hughes and Cesario ("The MEI Defendants").

Roger J. Magnuson, Peter W. Carter and Clifford S. Anderson, Minneapolis, MN, for Defendants Irwin L. Jacobs, IMR Fund, L.P., IMR Management Partners, L.P., and IMR General, Inc. ("The IMR Defendants").

## MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

### INTRODUCTION

Before the Court are cross motions respecting summary judgment and class notice/decertification in this securities fraud class action. Plaintiffs comprise two overlapping classes of purchasers of MEI stock. They charge two sets of somewhat interrelated Defendants with misrepresenting MEI's economic prospects over a period of two years. While Plaintiffs have failed to substantiate all of their claims, sufficient issues of fact remain so as to preclude summary judgment.

### BACKGROUND

This case has been the subject of two prior orders by the Court. In the 1970s and 80s MEI was engaged in various enterprises, including snack foods and soft drinks. The first set of Defendants (the "MEI" Defendants) were major shareholders as well as officers or directors of MEI. For example, Defendant Carl Pohlad owned roughly a quarter of MEI and served as its chairman. In 1986, MEI engineered a spin-off of its soft-drink subsidiaries to Pepsi, which resulted in the formation of a new company, MEI Diversified. The deal was structured to provide each MEI shareholder with $35 and one share of the "new" MEI, which retained other businesses.

The new MEI's mission was to acquire new businesses. For several years, it was unable to find suitable candidates. During this time, it lost money due to debts it had incurred borrowing money for its prospective acquisitions. In 1990, MEI finally settled on two new enterprises. First, it acquired New Dimensions in Medicine ("NDM"). During the previous year, MEI had loaned LecTec Corporation $45 million so that LecTec could purchase NDM. The arrangement provided that NDM would be used as collateral, and when LecTec defaulted, MEI foreclosed on NDM. Second, MEI acquired three chains of beauty salons ("Salons") which it planned to consolidate and operate profitably with a new management team.

During the next two and one-half years, MEI poured tens of millions of dollars into the Salons, but for a variety of reasons, was unable to stem losses. These losses undermined MEI generally, and in early 1993 MEI filed for bankruptcy protection. At that time, the value of MEI shares declined by ninety percent.

The above briefly recites the facts giving rise to this litigation. Further facts and allegations will be described throughout the discussion below.

### DISCUSSION

#### I. Standard of Decision

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgment as a matter of law if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510.

On a motion for summary judgment, the court views the evidence in favor of the non-moving party and gives that party the benefit of all justifiable inferences that can be drawn in its favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, judgment as a matter of law should not be

granted. *See Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511–12. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

## II. 10b–5 Liability

■ In *Alpern v. Utilicorp United, Inc.*, 84 F.3d 1525 (8th Cir.1996), the Eighth Circuit reiterated the now-familiar elements required to sustain a securities fraud claim. A claimant must show: (1) misrepresentation or omissions of material fact or acts that operated as a fraud or deceit; (2) causation, often analyzed in terms of materiality or reliance; (3) damages; and (4) fraudulent activity occurring in connection with the purchase or sale of a security. *Id.* at 1534. A misrepresentation may occur either through a statement which is untrue, or the omission of facts "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.* at 1533 (quoting 17 C.F.R. 240.10b–5). A misrepresentation is material if it is substantially likely "that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Alpern* at 1534 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–232, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988)).

■ Moreover, a claimant must demonstrate that the misrepresentation was made with "scienter," i.e., proof that the deception was knowing, intentional, or reckless. While an untrue statement made with reckless disregard for its truth or falsity satisfies the requirement, it is not sufficient simply to show that an untrue statement was made negligently. *Alpern*, at 1534. With this standard at hand, the Court turns to the merits.

## III. Allegations of Defendants' Motives

■ Strictly speaking, motive is not required to sustain a claim of securities fraud. In theory, a defendant with no financial or other interest in a securities transaction could nevertheless be guilty of fraud. Perhaps because this would be a rather rare occurrence, courts have looked to the existence of a motive to commit fraud in order to support the inference that fraud occurred. *See Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068–69 (5th Cir.1994). Where no motive appears, the quantum of proof of a defendant's fraudulent activity required to justify the inference that it was undertaken with scienter is "correspondingly greater." *Tuchman*, 14 F.3d at 1068; *see also DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.1990). Plaintiffs duly deny that they need to show a motive here. However, it is undisputed that the Defendants individually lost tens of millions of dollars as the value of their shares declined upon MEI's bankruptcy. Plaintiffs therefore correctly recognize that their theory must account for the seemingly irrational portrait of a cabal of corporate insiders propping up a failing enterprise with comforting statements and projections, so that they—the insiders—could lose millions when the alleged fraud was discovered.

### A. Fraudulent Transfer

■ Plaintiffs argue that the MEI defendants were concerned that the 1986 sale to Pepsi may have been attacked as a "fraudulent conveyance" were MEI to fall into bankruptcy prior to December 1992. Under Minnesota law in effect in 1986,[1] a transfer made without adequate consideration is constructively fraudulent if it (1) renders a corporation insolvent, (2) with unreasonably small assets in relation to the corporation's business, or (3) unable to pay debts reasonably expected to be incurred. Plaintiffs point to the fact that the shareholders of MEI—rather than MEI itself—benefitted from the spin-off of MEI's subsidiaries. While the transaction might be characterized in several

---

1. In 1987, Minnesota repealed its version of the Uniform Fraudulent Conveyance Act, replacing it with the new Uniform Fraudulent Transfer Act.

While there are differences between the two statutes, they do not appear to be material here.

ways—a sale of assets, or a dissolution and reincorporation, for example—Plaintiffs urge the Court to apply the "modern view" to "collapse" the transaction and test the substance of the transaction against fraudulent transfer law.

This the Court has done, but Plaintiffs' suspicions about the transfer are unsupported by facts. First, the Plaintiffs have not pointed to, nor has this Court found, examples of similar transactions which have been attacked as fraudulent. There is nothing inherently wrong with a corporation exiting certain businesses and thereby returning value to its shareholders. It is the shareholders, after all, who own the company. Such transactions should not be presumptively suspect. Moreover, Defendants argue that only "leveraged" transactions are subject to fraudulent transfer scrutiny. Whether this is always true is not before the Court; however, absent such leverage, and the accompanying deleterious effects on the transferor corporation, it is difficult to see fraud here.[2] *In re Vadnais*, 100 B.R. 127 (Bkrtcy.D.Mass. 1989) cited by Plaintiffs to illustrate the reach of the doctrine, is essentially a leveraged transaction—the corporation became indebted to the close shareholders in return for their ownership interests and non-compete agreements.[3]

Even if the Court scrutinizes the Pepsi transaction closely, Plaintiffs offer no basis for finding that it was made without an exchange of adequate consideration. Put another way, Plaintiff's theory automatically makes suspect any unleveraged intercorporate transfer involving a bona fide purchaser and a concomitant distribution to shareholders. The Court cannot discern any way in which an "innocent" corporation could get out of a business and return equity to shareholders without arousing this kind of suspi-

cion. Thus, the Court is very skeptical that the Pepsi sale could be viewed as having been effected without adequate consideration.

Moreover, Plaintiffs offer no evidence that the new MEI was insufficiently capitalized or unable to pay its debts. As Plaintiffs acknowledge, MEI paid debts after the sale and raised money for new ventures. Losing money due to debt payments does not mean that an enterprise is insufficiently capitalized; General Motors has lost billions in a single quarter without its capitalization being jeopardized. As reflected in its 1986 report to the SEC, MEI raised $125 million through offering notes issued *after the Pepsi sale.* As plaintiffs are well aware, MEI used these funds to fuel the very acquisitions which are at the heart of this litigation. Plaintiffs' argument that the Pepsi sale was vulnerable to attack as a fraudulent transfer is unsupported by the record.[4]

### B. Defendants' Concern About Fraudulent Transfers

■ Plaintiffs have produced exactly zero evidence that concern that the 1986 sale might be challenged motivated the Defendants in any way. All Plaintiffs have actually shown is that at least some of the Defendants knew what a fraudulent transfer was. Plaintiffs make much of the fact that Defendant Pohlad stated in his deposition that he didn't recall any discussion of fraudulent transfers in connection with the Pepsi sale; but denied any discussion in a declaration submitted thereafter. The problem is that neither "story" helps the Plaintiffs. What Plaintiffs evidently hope is that they can persuade a jury that *some other story* must be true by attacking the apparent inconsistency. This hope, however, is not evidence.

---

2. A sale is "leveraged" where an acquiror purchases the stock or assets of a target company with borrowed money, using the target's assets as collateral for the loans. *See* Robert A. Fogelson, Toward a Rational Treatment of Fraudulent Conveyance Cases Involving Leveraged Buyouts, 68 N.Y.U. L.Rev. 552, 539 (1993).

3. *Vadnais* rested, in significant part, on that Court's determination that the noncompete covenants provided by the departing shareholders did not convey sufficient value to the debtor. Re-

cently, however, the Bankruptcy Court in this District found that such agreements can have value, and refused to void a transfer on that basis. *In re Metro. Steel Fabricators, Inc.,* 191 B.R. 150 (Bankr.D.Minn.1996).

4. The Court notes that the MEI trustee, who might be expected to take an interest in such developments, has not, as far as the Court is aware, challenged the 1986 transaction.

### C. Perquisites and Status in the Business Community

Plaintiffs next argue that the Defendants sought to preserve their reputations in the local business community by artificially keeping MEI out of bankruptcy as long as possible. A witness testified that Defendant Pohlad stated that his reputation "was worth more than his money and he would do whatever it would take to make the situation [MEI] work out." The problem with bootstrapping scienter onto this lies in the fact that such sentiments are universal. Every member of the business community has a legitimate and substantial interest in protecting his or her reputation from the stain of a failed enterprise. Plaintiffs do suggest one specific reason Pohlad had for stringing MEI along. From 1991 to late 1992, Pohlad was negotiating the sale of his bank to First Bank. Had MEI lapsed into bankruptcy, Plaintiffs theorize that either bank regulators (the transaction was narrowly approved) or First Bank would have balked. This is not a bad theory, but again, Plaintiffs have no evidence beyond their own speculation that regulators or First Bank would have considered the status of MEI in evaluating the bank sale. Nor is there any evidence that Pohlad himself considered the two linked.

Plaintiffs suggest that a "stream of perquisites" may have motivated Defendants to keep MEI afloat. Absent concrete evidence of specific motivation, this implicit observation about human nature will rarely be sufficient to justify an inference of scienter. *Tuchman,* 14 F.3d at 1068–69. Plaintiffs cite numerous gifts that Defendants ordered sent to others, on behalf of MEI. That a company which sells nuts and snack foods should choose, in the interests of goodwill, to distribute nuts, chocolates and other generally small gifts to its officers and members of the business community is not surprising. Nor does Pohlad's apparently private use of the MEI jet aircraft intelligibly sustain a finding of scienter. The Court does not know what MEI's corporate policies were in regard to use of the company jet.

That no plausible motive specifically attributable to Defendants yet appears does not end the Court's inquiry. As stated, Plaintiffs need not prove motive, if they can otherwise demonstrate that material misrepresentations were knowingly or recklessly made. The Court accordingly turns to the alleged misrepresentations.

### IV. NDM Acquisition

■ Plaintiffs charge that MEI's foreclosure upon NDM due to LecTec's default was improperly accounted for in two interrelated ways. Rather than account for the transaction as a "purchase" reflecting a neutral or positive impact on MEI's balance sheet, as MEI did, Plaintiffs assert that it should have been treated as a "troubled debt restructuring" within the meaning of accountancy standards. This is so, Plaintiffs continue, because NDM was actually worth $21 million less than LecTec's loan balance. It is further claimed that MEI improperly imputed $24 million in "goodwill," which in accountancy is an asset with specific value. While such "creative accounting," if it occurred, would presumably be actionable in any respect (as it would dramatically overstate MEI's value), Plaintiffs offer a more labyrinthine explanation. MEI was obligated to keep its net worth above $65 million, or it faced early debt repayments. As accounted for by MEI, the company's net value was placed at $85 million. Deducting the allegedly inflated NDM value, however, would reduce MEI's value to just below $65 million.

There are significant problems with this hypothesis, but the one relevant to this Rule 56 proceeding and fatal to Plaintiffs' claim is the complete failure to offer competent evidence of NDM's "correct" valuation. Instead, Plaintiffs submit a letter written by MEI's counsel to Baxter Healthcare Corporation, NDM's pre-LecTec parent. MEI and Baxter were, in early 1991, embroiled in a dispute regarding Baxter's alleged misrepresentations and breach of a distribution agreement. The letter demands damages, including a claim for $21 million. Plaintiffs cite this as evidence of NDM's actual value and MEI's knowledge that it had falsely accounted for the transaction, to the tune of $21 million.

This case has produced untold thousands of documents, affidavits and pages of deposi-

tion testimony. Plaintiffs have submitted numerous expert affidavits attesting their claims, and have compiled a vast summary judgment record. If the Baxter letter is all the evidence Plaintiffs can muster, given the importance they attach to this transaction, Plaintiffs' submission is without merit.

▮ First, as the Baxter letter itself rather conspicuously recites, it is a settlement document which is inadmissible here under Fed.R.Evid. 408. Evidence submitted in response to a summary judgment motion must be admissible. Second, the attorney is not expert in the valuation of enterprises.

Conspicuously absent from the mass of documents allegedly supporting Plaintiffs' claims is some competent calculation of NDM's "true" value which is derived independently of a document generated in such a plainly adversarial context. The Court need not, as Plaintiffs intimate, pass on the veracity of MEI's counsel in the Baxter litigation. It suffices to observe that his estimation of NDM's value—if it even purports to do this—is inadmissible and irrelevant to these proceedings. All of the conclusions of Plaintiffs' experts based on this kind of posturing are similarly without merit. Accordingly, the Court concludes that Plaintiffs have failed to establish that MEI's method of accounting for the NDM acquisition was fraudulent.[5]

## V. Salons

Plaintiffs next attack the sufficiency of the Defendants' disclosures regarding the Salons. They advance two principal arguments. First, it is claimed that the Defendants expressed optimism about the Salons' economic prospects when in fact the Defendants privately expressed skepticism about such prospects. Relatedly, it is claimed that the disclosures of the Salons' performance— each of which consisted of bad news—did not adequately disclose all of the negative aspects of the Salons' operation so as to not mislead investors.

Defendants reply that only facts, not opinions, are disclosable, and cite as support *Staffin v. Greenberg*, 509 F.Supp. 825, 835 (E.D.Pa.1981) *aff'd* 672 F.2d 1196 (3rd Cir.

1982). However, to the extent that this case may be read to preclude consideration of a declarant's subjective belief at the time a statement is made, it has been overruled by *Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d Cir.1985) *cert. denied* 474 U.S. 946, 106 S.Ct. 342, 343, 88 L.Ed.2d 290 (1985). There, the Third Circuit held that "[a]n opinion that has been issued without a genuine belief or reasonable basis is an 'untrue' statement, which, if made knowingly or recklessly, may be actionable under § 10(b) and Rule 10b–5." *See also In re Donald J. Trump Casino Securities Litigation*, 7 F.3d 357, 372 (3d Cir.1993) *cert. denied* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). Moreover, in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090–1091, 111 S.Ct. 2749, 2756–2757, 115 L.Ed.2d 929 (1991), the Supreme Court reached the same conclusion regarding liability under § 14(a) of the Securities Exchange Act; subsequent courts have found this reasoning applicable to 10b–5 claims as well. *See Trump*, 7 F.3d at 372 n. 14; *Hanon v. Dataproducts Corp.* 976 F.2d 497, 501 (9th Cir.1992); *Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir.1993); *Mayer v. Mylod* 988 F.2d 635, 638 n. 2 (6th Cir.1993).

However, these and other courts have diverged somewhat over the scope of "opinion liability." *Raab* has narrowly interpreted *Virginia Bankshares* to make liable only those untrue statements of belief which involve "current" facts; predictions of future growth are not actionable. *Raab* at 290; *see also Oppenheimer v. Novell, Inc.*, 851 F.Supp. 412, 416 (D.Utah 1994) (citing *Raab* and holding that "A positive spin on publicly known facts is not actionable.") This distinction, which is not drawn in *Virginia Bankshares* itself, is difficult to fathom. A statement of belief as to future events *is* a statement of present fact, which may be untrue. This appears to be precisely what the Supreme Court meant when it observed that "[w]e think there is no room to deny that a statement of belief by corporate directors about a recommended course of action or an explanation of their reasons for recommend-

---

**5.** Accordingly, Plaintiffs' motion for partial summary judgment is denied.

ing it, can [be material]." 501 U.S. at 1090, 111 S.Ct. at 2756.

■ The Third, Sixth, and Ninth Circuits have not drawn the distinction articulated in *Raab,* and absent controlling authority in this Circuit, this Court declines to do so as well. Thus, a projection of statement of belief may be actionable to the extent that one of three implied factual assertions is inaccurate: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for the belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement. *Hanon,* 976 F.2d at 501. With this standard at hand, the Court will consider Defendants' allegedly misleading statements.

■ Plaintiffs challenge MEI's third-quarter 1990 results as misleading for failure properly to account for the NDM acquisition. However, the Court has already indicated that this claim is unfounded. Next, the Plaintiffs attack Defendants' statements, in late 1990 and early 1991, that the Salons were making "positive contributions" to MEI. Plaintiffs allege that this was misleading, because it omitted the fact that Salon sales were declining relative to the previous year, and that expenses—including a succession of "one-time" charges—were higher than expected. This information is not misleading. MEI had no duty to point out a decline in sales which was already reflected in diminished profitability. Moreover, MEI disclosed the charges it was incurring as they occurred; while its projection at the time of the Salons' purchase may have been inaccurate, this hardly establishes that it was made in other than good faith.

■ The statements which focus on the subjective beliefs of the Defendants begin in May 1991, when Defendant Pohlad described the acquisition of the Salons as a "golden opportunity" in a newspaper interview. Plaintiffs argue that "at the same time," an MEI officer described the performance of the Salons to date as "a disaster" in an internal memo. Plaintiffs have mischaracterized this evidence. This memo was written in *September* 1991, and focuses on expected third-quarter losses. However, in a November 11, 1991 press release, Defendants attributed third-quarter and nine-month period losses principally to the operation of a recently-sold snack food division, noting "positive contributions" from the Salons. Interestingly, Plaintiffs do not allege that the Salons' contribution was not positive. Instead, they argue that the disclosures did not adequately apprise the investing public of the "disastrous" performance of the Salons. But neither the press release nor the third-quarter 10–Q describe the Salons' performance glowingly; instead, it is described as "soft," but with "enhanced" prospects for improved earnings in 1991 and 1992.

Plaintiffs challenge the Defendants' expressions of optimism in the face of the Salons' negative performance. With virtually every press release from September 1991 until MEI's demise, Defendants sought to put the best spin on negative earnings. Defendants expressed a belief that the proper steps had been taken to stem the Salons' losses, and that a new management team was in place. In March 1992, Defendants also expressed hope for "improved earnings." In October 1992, the company described an agreement with Wal–Mart as "the first step toward realizing the Company's strategic goals and growth potential for the future," and the following month stated that the Salons had made sufficient improvement so as to make the future "increasingly optimistic."

Arrayed against this optimism, however, were the numbers. The Salons were, as one executive later testified, "bleeding us to death financially"; he also stated that by early 1992, he was hopeful for MEI's prospects, but had "deep, deep reservations." Moreover, MEI advanced the Salons substantial amounts of cash to meet operating expenses, which significantly increased MEI's overall investment. A consultant's report sent to MEI in late September 1991 described the Salons investment as "$70 million trapped in a dangerous and unprofitable situation." In sum, the financial portrait was consistently grim.

Despite this, Plaintiffs have not established that Defendants' statements of subjective belief were false. Concededly, even very "soft" statements can be misleading. *See Virginia*

*Bankshares,* 501 U.S. at 1091–1094, 111 S.Ct. at 2757–59 (analyzing statements by directors that proposed buyout price was "fair" and "high"). However, the Court is mindful that corporate directors have an almost boundless capacity for genuine optimism. With each quarter bringing a new wave of poor results, moreover, such expressions by MEI could not have significantly altered the "total mix" of information available to investors. While everyone at MEI may not have shared this optimism, there is no evidence that senior management's expressions were not genuine.

It is significant that MEI took steps which it hoped would place the enterprise on a paying basis. It engaged outside consultants in 1991 and 1992 to advise it as to how turn things around. The 1991 consultant—which had characterized the Salon investment as "dangerous"—expressed its belief that it could "materially assist MEI management in resolving the situation and assuring that MEI shareholders earn maximum return on their investment." MEI took advantage of this assistance by following the recommendation to terminate its management agreement with the Salons' former owner and install new management. The June 1992 consultations, based on the limited information Plaintiffs have chosen to include [6], appear not to be addressed towards operations, but finances. First Boston recommended that MEI solve its growing liquidity problems through various means. By Fall 1992, MEI disclosed that it was looking for "strategic partners" and exploring other options with investment bankers.

As the Supreme Court and lower courts have explained, the materiality of even misleading statements recedes in the face of truthful cautionary statements. *Virginia Bankshares,* 501 U.S. at 1097, 111 S.Ct. at 2760. Where such truthful statements "bespeak caution" to the investor, the materiality of the misleading statements, and the risk of deception thereby, "drop to nil." *Id; see also Trump,* 7 F.3d at 373; *Mayer,* 988 F.2d at 639. To an investor reading of MEI's still-optimistic (and vague) assessment of the future, the publicly-disclosed facts regarding its track record, and particularly, management's indication that it was in effect shopping around for someone to save MEI from itself unquestionably "bespoke caution." Thus, to the extent that the optimism was no longer justified, it was so on the basis of information to which the investing public already had access, namely MEI's consistently poor results. This is hardly the sort of incongruity requiring the skills of a financial analyst to assess. *Cf., Virginia Bankshares,* 501 U.S. at 1097, 111 S.Ct. at 2760. Rather, an investor would merely need to measure specific facts against vague hopes. Thus, to the degree that MEI's optimism may have been misleading because it was unfounded, the Court is convinced that the numbers alone sufficiently apprised investors of MEI's weaknesses and uncertain future.

## VI. IMR

At about this time, IMR arrived on the scene. IMR was an investment partnership headed by Defendant Irwin Jacobs, who was also an MEI outside director. In November 1992, IMR offered to purchase MEI for $66.7 million—$26.7 in cash and transfer of Brown Minneapolis Tank Co., which IMR valued at $40 million. This offer effectively valued MEI at $5 per share, which was at that time MEI's market price. Plaintiffs allege that this offer was a sham, designed to mislead the investing public into thinking that MEI's current share price was justified and that sophisticated investors with intimate knowledge of MEI's prospects were willing to put their own money at risk.

▬▬▬ The Plaintiffs do not cite cases supporting their view that this conduct—if it

---

**6.** Specifically, Plaintiffs have submitted the cover page and one section of a First Boston report to MEI. The report contemplates various alternatives recommended for MEI's consideration, to be viewed sequentially. The final alternative, clearly a last resort, is bankruptcy. Plaintiffs elide over this to state in their compendious "Statement of Specific Facts" ("SSF") that First Boston recommended bankruptcy. This sort of misleading characterization indicates that the Court erred in admitting the SSF, which is essentially 95 pages of argument about the facts. While the Court has considered it, along with the Defendants' response, it will view with disfavor similar submissions in the future.

occurred—would be illegal. However, the Court has determined that conduct which rises to the level of "securities manipulation" is actionable under § 10b–5. Securities manipulation involves activity which is "designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *S.E.C. v. Kimmes,* 799 F.Supp. 852, 858 (N.D.Ill.1992)(quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976)) *aff'd* 997 F.2d 287 (7th Cir.1993). Conduct which falsely persuades the public that trading activity in a security reflects actual demand, rather than a "mirage," is actionable. *Kimmes,* 799 F.Supp. at 859; *S.E.C. v. Sayegh* 906 F.Supp. 939, 946–948 (S.D.N.Y.1995) *aff'd* 101 F.3d 685 (2nd Cir.1996). Plaintiffs' claims thus fall within the "broad scope and flexible interpretation [given the securities laws] in order to encompass all of the ingenious variations of securities fraud that may arise." *Kimmes,* 799 F.Supp. at 858.

▇ Plaintiffs recite several alleged motives for the scheme: the discredited fraudulent transfer theory; the long history of "back-scratching" between Jacobs and Pohlad; Jacobs' desire to avoid a $9 million loss if MEI collapsed; and relatedly, MEI's critical need for a $20 million infusion to allow it to meet its short-term obligations. The sham offer, Plaintiffs assert, bought MEI time for a rescue to occur. There is no evidence that reciprocity (if this is even "wrong") or the fraudulent transfer fear motivated the IMR offer. However, the theory that IMR was buying time for MEI is plausible, and supported by inferences which the Court must, on this Rule 56 motion, draw in favor of the Plaintiffs.

Specifically, Plaintiffs have raised genuine questions regarding the sincerity of the offer. A memorandum written the day after MEI filed for bankruptcy by the firm engaged by MEI to study the IMR proposal concluded that "IMR [had been] dragging its feet, exhibiting no real intention to do the deal that they proposed." At the time IMR withdrew its offer, it noted the unfavorable due diligence review which its auditors had performed. It is possible that this review made clearer to Jacobs the facts surrounding the

poor operating performance of the Salons. But these facts were already pretty clear, as MEI's ample disclosures and internal documents during the previous two years attest.

In an October 1992 memo, Defendant Benson—MEI's President—noted that management is concerned that once a potential partner learns of MEI's financial condition it may become hesitant to make an investment. It is difficult to imagine that Jacobs was not familiar with this fact. The parties dispute whether potential health care liabilities poisoned the deal, and whether BMT's value was itself artificially inflated to make the value of MEI appear greater. On this record, however, the critical observation appears to be that the fundamental weaknesses of MEI may have been apparent to Jacobs long before his offer and the accompanying delay for due diligence. This gives rise to an inference—not a conclusion—that Jacobs (and MEI, which published the offer in November 1992) intended the offer to manipulate the price of MEI stock and attract genuine investors. Perhaps Jacobs and IMR were "hesitant," as Benson put it, but nevertheless genuinely willing to consider a deal. But the record before the Court does not foreclose other, inculpatory possibilities.

There is a final transaction relative to these matters. In that October 23 memo, Defendant Benson stated that some form of "restructuring," possibly including bankruptcy, would be the "logical remaining alternative" if MEI was unable to find an outside investor. On or about Friday, February 19, 1993, IMR withdrew its offer and recommended that MEI seek bankruptcy protection. During a board meeting convened on February 22, Defendant Benson stated that this recommendation had "essentially reinforced management's view of the matter *which had been discussed earlier with appropriate counsel."* (Emphasis added.) One, or possibly two days prior to IMR's recommendation, stock analyst Michael Leonard testified he placed a call to Benson. Leonard had noted MEI's low stock price. Leonard asked Benson if there were "alternate plans" in case the IMR deal fell through. According to Benson, there were. Leonard then asked,

point-blank ... Don, is this company going to file Chapter 11? Are you guys going to go into bankruptcy? And he said, absolutely not. He said that's not even in the works.

(Minish Aff. Ex. 178.)

On this record, it is impossible to square Benson's alleged statements with the facts. There were "alternate plans," including a possible bankruptcy, in existence four months prior to the bankruptcy. More damning, are Benson's comments at the board meeting where he indicated that management and counsel had discussed approvingly a bankruptcy filing prior to the IMR withdrawal. Perhaps Benson can explain away this inconsistency, but he will have do to so at trial.

## CONCLUSION

Plaintiffs have not established genuine questions of material fact with respect to Defendant's pre-November 1992 disclosures. The statements of optimism, tinctured throughout the class period with reports of disappointing results, bespoke caution to investors considering the purchase of MEI securities. However, beginning with the IMR offer on November 17, 1992, genuine questions exist regarding the sincerity and purpose of the offer, and MEI's apparently untruthful public disclosure of its contingency plans. Such conduct could have altered the total mix of information available to investors, and concealed for several months MEI's impending failure. Moreover, given the disputed facts surrounding these activities, the Court cannot summarily conclude that they were undertaken without scienter. For these reasons, the Court will deny Defendants' motions, but will limit the class period to November 17, 1992 through February 23, 1993.

Because this limitation significantly alters the complexion of the class action proceedings, the Court will deny, for now, Plaintiffs' motion to approve class notice and Defendants' motion to decertify. Counsel for the two Plaintiff classes shall inform the Court within ten days of the issuance of this order how they intend to proceed given that the new class definition changes the composition and effaces whatever distinctions existed between the *Salperto* and *Brogren* classes. At that time, the Court will set an expedited briefing schedule limited to consideration of the decertification/notice cross-motions which will reflect the new class definition.

IT IS HEREBY ORDERED THAT:

A. In the matter of *Brogren, et al. v. Pohlad*, Civ. No. 3–93–714,

1. Defendant Cesario's ("The MEI Defendants'") motion to dismiss/for summary judgment is denied;

2. Defendant Cesario's motion for decertification is denied, without prejudice;

3. The motion of the IMR Defendants for summary judgment is denied;

4. Plaintiffs' motion to approve notice to class is denied, without prejudice;

5. Plaintiffs' motion for partial summary judgment is denied.

B. In the matter of *Salperto, et al. v. Pohlad*, Civ. No. 3–94–20,

1. Defendant Handmaker's ("The MEI Defendants'") motion to dismiss/for summary judgment is denied;

2. Defendant Handmaker's motion to decertify is denied, without prejudice;

3. Plaintiffs' motion to approve notice to class is denied, without prejudice;

4. Plaintiffs' motion for partial summary judgment is denied.